**BEST FLAVORS, INC., Plaintiff,**

v.

**MYSTIC RIVER BREWING CO., Kennebunkport Brewing Company and Mystic Seaport Museum, Inc., Defendants.**

**Civ. No. 95–81–P–H.**

United States District Court,
D. Maine.

June 1, 1995.

Alice Fradin, William R. Borchard, Cowan Liebowitz & Latman, P.C., Paul R. Levenson, New York City, Patricia A. Peard, Bernstein Shur Sawyer & Nelson, Portland, ME, for plaintiff.

Thomas L. Casagrande, Shaun S. Sullivan, Wiggin & Dana, New Haven, CT, Jeffrey M. White, Pierce Atwood Scribner Allen Smith & Lancaster, Portland, ME, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORNBY, District Judge.

This is a trademark infringement action in which the owner of the beverage marks "ROYAL MISTIC" and "MISTIC" seeks to enjoin the owner of "MYSTIC SEAPORT" from bringing out a line of beverages under that mark. I conclude that an injunction should be issued.

### FINDINGS OF FACT

1. The plaintiff, Best Flavors, Inc., owns the trademarks "ROYAL MISTIC" and "MISTIC," with federal registrations since 1990 and 1993 for spring water, iced teas, flavored sparkling water and fruit drinks. It licenses the use of these marks to Joseph Victori Wines, Inc., a related company under essentially the same ownership. Victori makes and distributes nonalcoholic beverages under these marks.

2. Best Flavors was created in 1989 and has been using the marks continuously since then. It began with eight flavored carbonated drinks and five juice-added drinks. It has engaged in a continuous process of adding and deleting beverage products in a successful attempt to capture a large market. In 1990, for example, it deleted three unsweetened water beverages and added three iced teas. Various iced tea flavors have been added and replaced during the years since then. In 1991, it added its so-called "blue bottle" line with clear beverages in a bottle slightly blue in tint. In 1992, it added five flavors of noncarbonated juice-type drinks. In 1993, it added and deleted various sizes of its product line. In 1994, it added plain

waters, three new flavors, its "MEGAMIS-TIC" line of larger bottles and, in addition, a new line of energy drinks. In 1995, it added "JUMPING GEMS" (a children's drink with suspended gelatin particles), a piña colada flavor and a coffee cola and root beer. It is currently in the process of introducing four flavors of "sports drinks" with sports caps on the bottles.

3. Sales have grown from under $10 million in 1990 to $128 million in 1994. In the process over one billion bottles of MISTIC beverages have been sold.

4. Together with its distributors, Best Flavors spent over $25 million on advertising and promotions in 1994, and is at least equalling that amount in 1995.

5. Over seventy per cent of MISTIC beverages are sold "up and down the street," a term that refers to a range of delicatessens, convenience stores and small grocery stores. (Of this seventy per cent of sales, about twenty per cent are in convenience chain stores and the other fifty percent are not.) Less than twenty per cent of sales are in supermarkets; less than five per cent in restaurants; and less than five per cent in warehouse clubs. For "up and down the street" sales, there is no uniform manner of display, except that chilled, nonalcoholic beverages are generally sold in glass-door refrigerators and are grouped for display and sale separately from chilled alcoholic beverages. The individual retailer controls where the products are placed, and this may be affected by a variety of factors, such as height of the shelves, particular promotion allowances, etc.

6. The Marine Historical Association was founded in 1929 as a nonprofit corporation, and adopted the name "MYSTIC SEAPORT" after World War II. It is now known as Mystic Seaport Museum, Inc., one of the defendants here. It is an internationally known and respected museum, featuring various aspects of shipbuilding and repair, the history of the shipping trade and life in the nineteenth century. Its mission is to preserve the maritime history of the region and to foster a broad public understanding of America and the sea. It is located in Mystic, Connecticut, from which it takes its name.

7. Mystic Seaport Museum has registered the trademark "MYSTIC SEAPORT" in the years since 1968 for museum services related to marine and associated historical matters; retail mail order gift and variety store services; coffee cups, beverage glasses, glass figurines and porcelain figurines; movie film and videotape featuring historical and maritime subject matter; posters, photographic prints, photographs, books and pamphlets dealing with maritime subjects; and clothing articles, namely shirts, jackets, neckties, scarves and sweaters. It has never registered the mark for beverages, although it is now attempting to do so.

8. In an effort to further its educational mission and faced like many nonprofit institutions with fundraising needs, Mystic Seaport Museum has tried to take advantage of its wide name recognition and prestige through commercial ventures related to its mission. Starting with on-premises sales of goods and services specifically related to its historic and maritime mission, Mystic Seaport Museum has attempted to develop a historically related food and beverage line in a broader fashion. Specifically, following successful sales of root beer on its premises, Mystic Seaport Museum has recently developed a line of nonalcoholic beverages consistent with its nineteenth century historic theme—spruce beer, birch beer, ginger beer, lemon beer, root beer, and cream beer—and plans to distribute them in "MYSTIC SEAPORT"-labeled bottles throughout New England, New York and New Jersey. It has also engaged in plans to market an alcoholic pale ale reflecting a nineteenth century heritage. To that end, it has engaged in licensing agreements with the other two defendants, Mystic River Brewing Co. and Kennebunkport Brewing Company, to manufacture and distribute such beverages under the name "MYSTIC SEAPORT."[1]

9. Mystic Seaport Museum tested root beer flavors during two weekends in the summer of 1992 with visitors to the Museum.

---

1. All three defendants have presented a unitary defense. I shall therefore treat them together and refer to them simply as the defendant or as Mystic Seaport Museum.

The first time the root beer was sold off the premises with a label was in November of 1994 at a one-day Boston trade show for gourmet distributors. There were also sales on the museum premises during a two-day event in December (240 to 480 bottles). The first general off-premises sale did not occur until around the second week of February, 1995. Ginger beer and spruce beer were also introduced in February; lemon beer and cream beer were introduced in early May of 1995. The pale ale product was first produced and sold in January of 1995 in keg form. It has not yet been bottled, but plans call for it to be ready around the end of June or beginning of July of 1995.

10. MISTIC root beer and coffee cola were not available for release to distributors until around March of 1995, but had been in development for some time before then.

11. At the time Mystic Seaport Museum decided to enter the beverage market, it had no knowledge of Best Flavors' plan to introduce its coffee cola and root beer in 1995.

12. At the time Best Flavors created its coffee cola and root beer, together with their labeling and packaging, it had no knowledge of Mystic Seaport Museum's intent to enter the beverage market.

### Prior Usage

13. Best Flavors used its MISTIC marks in the nonalcoholic beverage market extensively before Mystic Seaport Museum's entry into that market.

■ 14. Root beer and coffee cola are a natural and obvious extension of, and a related item to, Best Flavors' line of MISTIC and ROYAL MISTIC beverages, which already included carbonated beverages. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 28 (1st Cir.1989).[2] They are well within a natural extension of the categories of goods listed and issued under the federal registrations. I

make this finding notwithstanding the fact that in some of its advertising for its previous line of non-cola beverages, Best Flavors has denigrated cola-type beverages. That advertising technique does not alter the fact that beverages like root beer, coffee cola, and the MYSTIC SEAPORT line of soft drinks are all closely related and a natural outgrowth of MISTIC's carbonated beverages. Alcoholic beverages are more problematic an extension. Although competition is for the "beverage share of the belly," there is a clear line between alcoholic and nonalcoholic beverages—culturally, as a matter of legal regulation and in terms of who consumes them. I find that alcoholic beverages are not a natural and obvious extension of Best Flavors' line of beverages.

■ 15. Root beer, spruce beer, ginger beer, lemon beer, cream beer, birch beer and pale ale are not a natural extension of, or related goods or services to, the items listed in the various MYSTIC SEAPORT registrations. Moreover, any previous sales of beverages were on museum grounds. Indeed, the evidence indicates that sales of museum products generally have been either on the museum grounds or through a catalogue (where the purchaser clearly knows that he or she is purchasing from Mystic Seaport Museum). Off-premises sales of these beverages, therefore, are not a predictable or natural extension of the previous uses under the registered marks.

### Likelihood of Confusion Factors

The First Circuit Court of Appeals has instructed trial judges in trademark cases to consider eight elements in making the factual determination regarding likelihood of confusion. *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir.1989). The following factual findings are therefore organized according to those eight elements.

**2.** By citing cases in my Findings of Fact, I do not suggest that they have influenced my factual findings. To use case precedents to justify (or reject or overturn) factual findings is highly problematic. Each case concerning confusion and business expansion must stand on its own merits, for marketing and promotion vary widely, by geography, by product and, importantly, over time (as

marketing and cultures change). Indeed, one can find a case to support or conflict with almost every factual finding. That is as it should be. The cases I have cited in the Findings of Fact are chosen instead to suggest why I believe a finding on a particular factual issue is helpful or necessary.

## (1) Similarity of the Marks

16. The marks in question are: the plaintiff's "ROYAL MISTIC" and "MISTIC" and the defendant's "MYSTIC SEAPORT." Discovering that consumers often reduce the name to a single word, the plaintiff frequently uses the term "MISTIC" without the "ROYAL" and has separately registered "MISTIC." In the defendant's nonalcoholic beverage labeling, the word "Mystic" is given prominence over "Seaport." The words "Mystic" and "MISTIC" sound exactly the same and their spelling is identical except for the first vowel. Indeed, prior to Mystic Seaport Museum's marketing of beverages, the name of Best Flavors' product ("MISTIC") was sometimes misspelled by consumers, replacing the "i" with a "y." The meaning of the two words is not identical. "Mystic" has to do with mysticism or magic; "MISTIC," on the other hand, is not a real word, although it may be suggestive of the root word "mist" meaning air-suspended water droplets or, for those who do not care about spelling, carry the same meaning as "mystic." (The plaintiff's previous advertising sometimes referred to a "Mistical experience" and its new advertisements feature a mystic, a person named Zoltan.) In fact, the word "Mystic" in "MYSTIC SEAPORT" has no mystical or magical connotation; it derives from the Indian word for the river meeting the sea at Mystic, Connecticut. Thus, neither of the "M*stic"[3] words is closely associated with the underlying product. The "M*stic" words are virtually identical so far as a consumer is concerned.

17. But in considering trademarks I am to consider the mark as a whole. See Pignons S.A. de Mecanique v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir.1981); Amstar Corp. v. Domino's Pizza, 615 F.2d 252, 261 (5th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Here, one mark is "MISTIC" and the other is "MYSTIC SEAPORT." "Seaport" is a completely different term, and to those who are familiar with the Mystic area or the Museum, the phrase has a specific connotation, namely a geographic location and a historic cultural institution. In fact, Mystic Seaport Museum has an international reputation for what it does in the preservation and reproduction of nineteenth century ships and seafaring life. It is regularly featured on television and in other media on both a regional and national basis.

18. On the other hand, the defendant's nonalcoholic labels in question deemphasize the word "Seaport." The word "Mystic" is much more prominent, in both typesize and typeface, and is located above, not next to, the word "Seaport." Given the colors of the label, the first effect from a distance is to highlight the word "Mystic" alone. The bottles are the same colors and shape as the MISTIC root beer and coffee cola, although the latter are larger. Best Flavors has not sued for trade dress infringement itself, but this context contributes to the confusion inherent in the marks. See Pignons, 657 F.2d at 487; Coca–Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 280, 283–84 (1st Cir.), cert. denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947) ("[O]n the issue of trademark infringement words are not to be compared syllable by syllable, vowel by vowel and consonant by consonant. Instead, they are to be compared as ordinary purchasers of soft drinks would compare them, that is, on the basis of their general appearance both in construction and in over-all impression on the eye. Thus the type, as script or block for instance, in which alleged infringing words are printed, the color thereof, and the color and composition of the background upon which they appear, as well as the spelling of the words themselves, are important considerations on the issue of trade-mark infringement.") Moreover, it is difficult for a newcomer to avoid mark confusion by using a different trade dress so far as shape, size and color of bottle and label are concerned inasmuch as Best Flavors has been continuously adding items of different colors, sizes and shape to its line. (The parties ended up with bottles of the same style and color, but different size, for their new products because these are standard bottles, comparable to a

---

**3.** I use the "*" as a "wild card" character in spelling "M*stic" when referring to that word in both marks, whether spelled with an "i" or a "y."

typical beer bottle, currently in vogue for premium nonalcoholic items of this sort.)

19. In sum, a first impression of Mystic Seaport Museum's nonalcoholic beverage bottle reveals that it is a "M*stic" beverage, a word that sounds the same under either spelling. This factor supports likelihood of confusion: "Seaport" could just be a new line of MISTIC beverages. A closer, more careful look, on the other hand, would reveal the word "Seaport" and if a consumer stopped to read more of the text it would make clear that the beverage was associated specifically with Mystic Seaport Museum.

20. On the pale ale label, "Mystic" and "Seaport" are equally prominent, side by side, and also equally prominent with the words "Pale Ale." A quick glance, therefore, does not focus on "Mystic" but the entire four words "MYSTIC SEAPORT PALE ALE." This phrase is quite different from Best Flavors' "MISTIC" or "ROYAL MISTIC," and there is less likelihood of confusion.

### (2) Similarity of the Goods

■ 21. The parties dispute the level of generality at which I should categorize the goods in question. The possibilities range from a beverage-by-beverage analysis to categorization at ascending levels of generality. Both parties now sell root beer, although MISTIC root beer was not yet being marketed when Mystic Seaport Museum decided to enter the beverage market. Both parties sell carbonated beverages, although Best Flavors was not selling cola or dark carbonated beverages at the time Mystic Seaport Museum decided to enter the beverage market. On the other hand, Best Flavors has been selling a wide range of nonalcoholic (including carbonated) beverages, frequently adding and deleting lines. Both parties sell nonalcoholic beverages, but Mystic Seaport Museum proposes to sell an alcoholic ale as well.

22. Despite the testimony that the Museum markets premium products that appeal to a high-cultured, historic, affluent interest while MISTIC appeals to a youthful, modest income, "new age" interest, I find that carbonated beverages are closely related, whether called "soda" or not. Indeed, all chilled nonalcoholic beverages, other than perhaps milk, are closely related for many beverage purchasing decisions. The competition in the market is (to use the trade's term) for "the beverage share of the belly."

23. The price of both parties' nonalcoholic products is low, in the $1 to $2 range. As such, it is frequently an impulse purchase item without a great deal of study or attention as a consumer chooses a beverage for lunch or to quench a thirst on a hot afternoon. The larger MISTIC products have a significantly lower price *per ounce;* this will make a difference to a substantial number of persons but another substantial number will make the decision on the overall bottle price for a single beverage, ignoring the quantity. In short, chilled beverages such as iced teas, spring water, sparkling water, sodas (whether highfalutin or low brow) are all similar goods to the thirsty consumer.

24. The similarity of the nonalcoholic beverages, therefore, makes confusion likely.

25. I find that the defendant's *alcoholic* beverages, on the other hand, are not similar to Best Flavors' beverages. True, they are chilled liquid designed to quench a thirst. But alcoholic and nonalcoholic beverages are distinct commodities in our culture. Alcoholic beverages are subject to extensive state regulation, which makes them unavailable to people under 21 and which restricts the trademark owner's control over where they can be distributed. In addition, consumers are consciously aware of whether they are choosing an alcoholic or a nonalcoholic beverage. This makes confusion less likely.

### (3) Relationship Between the Parties' Channels of Trade [4]

■ 26. As I stated in paragraph 5, MISTIC beverages are sold in a wide variety of

---

4. Much of the discussion of Mystic Seaport Museum's advertising and channels of trade must be predictive since it has not yet begun to market its product extensively and is awaiting the outcome of this lawsuit as well as an independent problem it confronts. Likewise, there can be no proof of actual confusion on the part of consumers at this point, since Mystic Seaport Museum has not distributed beverages beyond its premises, except for limited sales in Rhode Island and Connecticut.

trade channels. Currently Mystic Seaport Museum's nonalcoholic beverages are not distributed through supermarket, warehouse club or convenience store chains. This restriction is partly because of "image" concerns and partly because significant "slotting fees" ($100,000 per chain) are required to get a new beverage product on the shelves. Mystic Seaport Museum has not foresworn the possibility of selling through such facilities if its product line is successful. At the present time, however, Mystic Seaport Museum plans to focus its nonalcoholic beverage distribution on gourmet and specialty stores within New England, New York and New Jersey. Mystic Seaport Museum made these intentions clear to its licensee, Mystic River Brewing Co., and Mystic River agrees with them. There is nothing in the license agreement that prohibits the use of other types of retailers, however, and the license agreement requires Mystic River Brewing Co. to use its best efforts to achieve maximum sales volume and distribution. License Agreement for Root Beer ¶ 5.5. Moreover, although Mystic River Brewing Co. assists its distributors in finding retailers, nothing prevents those distributors from placing the product wherever they are able. Indeed, the distribution agreements require the distributors to use their "best efforts at all times" to increase and satisfy demand "by selling products to *any* entity or person within the designated territory." Distribution Agreement ¶ 5 (emphasis supplied).[5] In the Mystic/Groton/New London area, MYSTIC SEAPORT beverages have turned up in a number of locations that would not fit its ordinary mar-

keting plans, and Best Flavors' investigation turned up about sixteen retailers in that area where both products appeared side by side. Mystic Seaport Museum explains this phenomenon on the basis that within that area all retailers wish to sell products that refer to Mystic Seaport Museum, the best known tourist attraction. There is no proof of actual overlap outside these markets, but at the present time distribution has not really begun—partly because of this lawsuit and partly because of a separate distribution problem. I conclude that ultimately there will be a substantial overlap in the retail locations where MISTIC and MYSTIC SEAPORT beverages are sold. Undoubtedly there will be within the region a significant number of stores that carry one line but not the other. Nevertheless, there will also be substantial overlap in the channels of trade. This factor contributes to confusion.

27. MYSTIC SEAPORT Pale Ale has not yet been distributed but only sold in draft on the museum premises. Consequently, the channels of trade for the ale are not yet established. Kennebunkport Brewing Company, the licensee, however, has begun to sign up distributors. Generally, state law affects the locations where an alcoholic product is ultimately sold and distributed and these locations are not within the control of Kennebunkport Brewing Company or Mystic Seaport Museum. As a result, MYSTIC SEAPORT Pale Ale will generally be available in restaurants, package stores, convenience stores, bars and other locations where

5. The channels of trade, advertising, and classes of purchasers are an area of significant factual dispute. Donald Benoit, the president of Mystic River Brewing Co., the nonalcoholic beverage distributor for Mystic Seaport Museum, testified firmly that the goal is to place the products only in high end stores such as gourmet and specialty shops and that there are no plans to go into supermarkets, convenience store chains, "mom and pop" stores, etc. This testimony is inconsistent with an earlier market plan that he had developed for discussion purposes within the company. Although it is quite conceivable that original marketing plans could have changed after discussion and consideration, I note also that James Farrell, the director of food services at the Mystic Seaport Museum and therefore the person ultimately responsible for this program, testified specifically that, while Mystic Seaport Museum's intent is to *target* specialty and gourmet stores, it does not intend to *limit* its distribution to them. Instead, it is interested in maximizing the sales of these products and has Mystic River Brewing Co.'s commitment to *maximize* sales. Likewise, in the briefs and opening statements the defendants' lawyers have been careful not to preclude entirely the possibility of such expansion ("never say never"). Mystic Seaport Museum's purpose, of course, is both to pursue its educational mission among the public and to obtain income to support that mission. Considering all these factors together with other testimony, as well as what has happened in the immediate geographic area of the Museum, I conclude that as the opportunities present themselves these nonalcoholic products will be placed wherever they can successfully be sold notwithstanding the contrary testimony of Mr. Benoit.

beer products are for sale. Thus, it will be available in some proximity to Best Flavors' products in a significant number of those channels. This factor contributes to some confusion.

### (4) Relationship Between the Parties' Advertising

■ 28. The content of the respective advertising campaigns is likely to be different.[6] Best Flavors targets a younger age group, 12 to 35 or even under 25, and of modest income, and uses advertisements that are contemporary and light (even "cheesy," in the trade's terminology), reflecting what the industry calls a "new age" taste for clearer, non-cola beverages. On the other hand, Best Flavors also issues a free-standing insert nationally once a year in the Sunday newspaper supplements reaching an age group generally age 21 to 49. Mystic Seaport Museum says that it will focus its advertising campaign on older, more affluent consumers with cultural and historic interests.

29. The parties' advertising methods both differ and often overlap. Specifically, both parties will rely extensively upon point of sale advertising—i.e., posters and other displays in the retail outlets and tabletop advertising in restaurants. Mystic Seaport Museum will not be able to match Best Flavors' significant television advertising budget, but will do some public radio advertising. Mystic Seaport Museum will advertise in the New England, New York and New Jersey regions whereas MISTIC beverages will be advertised nationally.

30. This factor suggests some modest likelihood of confusion.

31. There is as yet no information on Mystic Seaport Museum's advertising for its pale ale.

### (5) Classes of Prospective Purchasers

■ 32. For soft drinks, the parties target different audiences but naturally seek not to foreclose others from buying and consuming their product. In fact, there will be substantial overlap. Almost one-quarter (100,000) of Mystic Seaport Museum's annual attendance (450,000) consists of young people

between the ages of 12 and 35. This age group is MISTIC's primary audience. Mystic Seaport Museum argues that it will appeal to a category of more sophisticated consumers than does MISTIC. This "sophistication" is measured by household income, age and cultural interests. That is not the kind of "sophisticated purchaser" that courts have in mind, however, when analyzing likelihood of confusion. That description applies to people who have experience in purchasing a product and who care about their purchase decisions; typically, "high ticket" items are involved. Here, on the other hand, the product costs under $2 and is frequently purchased quickly and impulsively. In this context, the courts' so-called "ordinarily prudent purchaser" does not stop to study labels but reaches for a quickly identifiable beverage. Moreover, there can be frequent crossovers, as many people do not limit themselves to drinking one beverage but tend to be influenced in their choices by time and circumstances. I conclude, therefore, that the classes of purchasers overlap and cannot be segregated into an older class with higher incomes and historic and cultural interests, as opposed to a younger class of more modest income and more frivolous interests. This factor suggests confusion in the nonalcoholic beverage market.

33. For the pale ale, on the other hand, the consumers are 21 or older, thus reducing the amount of consumer overlap, and Mystic Seaport Museum is focusing on consumers of premium microbrewery beers and ales with a degree of sophistication in their choice of alcohol. This factor weighs against confusion.

### (6) Actual Confusion

34. There is and can be no evidence of actual confusion since Mystic Seaport Museum has not begun any extensive distribution of its beverage products.[7]

### (7) Strength of the Plaintiff's Mark

■ 35. The "MISTIC" mark is very strong. It is not descriptive, but is at least suggestive (mist/water/liquid) and arguably

6. See note 4, supra.

7. See note 4, supra.

completely fanciful or arbitrary. Huge amounts have been spent on national advertising campaigns and on other kinds of promotions targeted at soft drink consumers and there has been extensive recognition in the media. The plaintiff has built a substantial product line with a variety of beverages and has sold a tremendous number of bottles in the past five or six years. "MYSTIC SEAPORT" is also a very strong mark, reflecting the historic identity of the Mystic Seaport Museum, a cultural organization with national and international recognition. This identity has been building for almost fifty years, receiving wide and frequent media recognition and coverage. *See Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 32 (1st Cir. 1989) (effect of broad media exposure of Boston Marathon). It has not previously been associated with beverages, however. This factor suggests confusion in soft drinks but not alcohol.

### (8) The Defendant's Intent in Adopting Its Mark

36. Under Rule 52(c) of the Federal Rules of Civil Procedure, I ruled during the trial at the close of the plaintiff's case that the plaintiff had not introduced sufficient evidence of any wrongful intent by Mystic Seaport Museum to permit this element to remain in the case. Specifically, the question is whether Mystic Seaport Museum was trying in any fashion to take advantage of MISTIC's good will, reputation and market recognition, or whether it was simply using its own name without any such intent. I concluded at the close of the plaintiff's case that Best Flavors had not presented any direct evidence of wrongful intent and had not presented any circumstantial evidence that would persuade me to infer that Mystic Seaport Museum's decision was based in any way upon an intent to take advantage of MISTIC's public renown. This factor, therefore, does not affect likelihood of confusion. (These are my findings of fact and conclusions of law as required under Fed.R.Civ.P. 52(c).)

### Overall Confusion

37. All of these eight factors are designed only to guide the trier of fact in reaching a conclusion on the likelihood of confusion in the use of the respective marks. I conclude here as a factual matter, *see Aktiebolaget Electrolux v. Armatron Int'l, Inc.,* 999 F.2d 1, 4 (1st Cir.1993) (likelihood of confusion a factual finding resting upon weighing of eight factors); *cf. Union Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 366, 383 (7th Cir.); *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *but see Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004–05 (2d Cir.1983) (likelihood of confusion is conclusion of law once the underlying factors are factually resolved), that, whether the products are displayed side by side or presented alone, *see Union Carbide,* 531 F.2d at 382, there is a substantial likelihood of confusion as to a significant number of purchasers. These are low price items, often trading in the same channels, often purchased in a hurry and on impulse, frequently by people who will not stop to read a label carefully. *Cf. E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 457, 464–65 (N.D.Cal.1991) (inexpensive wines found to be impulse purchase making confusion likely). Consumers of MISTIC beverages come from all ranks of income, education and interests, notwithstanding the advertising targeted toward a particular category. The clientele, to quote one witness, "ultimately is everyone with a mouth." Similarly, although Mystic Seaport Museum may target its distribution to an older more affluent category, many young people will also be exposed to its product through their parents or directly. Despite the differing tone of the parties' respective advertising, there will be substantial overlap in exposure. *See Glen Raven Mills, Inc. v. Ramada Int'l, Inc.,* 852 F.Supp. 1544, 1550–51 (M.D.Fla.1994). The layout of the MYSTIC SEAPORT soda label encourages a focus on the word "Mystic"; that is the primary effect of the label upon a quick look. The "MISTIC" mark is very strong. Undoubtedly there will be consumers who will look carefully for a MYSTIC SEAPORT beverage and others who will look carefully for a MISTIC. But there will be a substantial number who will simply grab a "M*STIC" beverage or indeed will ask for such a beverage from a waitperson where sound is the only medium. Although the

918

actual beverage may be observably different, the consumer will be confused as to source. *See Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1130 (2nd Cir. 1982). Put another way, an "appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1003 (2nd Cir.1983), *quoting Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2nd Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

■ 38. I reach a different conclusion in the case of alcoholic beverages. The MISTIC and ROYAL MISTIC lines have had no presence in the alcoholic beverage market. Young consumers have no role there. The proposed ale label has the words "Mystic" and "Seaport" side by side with equal prominence on a ship's figurehead. The goods are dissimilar, the "MISTIC" mark has less strength in that market, and there is simply no reason to think that anyone seeing the label "MYSTIC SEAPORT PALE ALE" would conclude that it was somehow associated with MISTIC or ROYAL MISTIC.

## CONCLUSIONS OF LAW

1. The court has jurisdiction under 28 U.S.C. § 1338 (trademarks and unfair competition), diversity jurisdiction under 28 U.S.C. § 1332, and supplemental jurisdiction under 28 U.S.C. § 1367.

2. On the facts of this case, there is no distinction between Count I, trademark infringement, 15 U.S.C. § 1114(1), and Count II, false designation of origin, 15 U.S.C. § 1125(a).

3. The plaintiff does not seek damages.

4. The plaintiff makes no claim for trade dress infringement.

5. The plaintiff has stipulated that it is not pursuing its state cause of action for unfair trade practices under 5 M.R.S.A. § 207.

6. The plaintiff has stipulated that any rights to recover under state law are governed by the trademark analysis except for its dilution claim under 10 M.R.S.A. § 1530.

■ 7. There are no Maine Law Court cases interpreting Maine's anti-dilution statute. The statute mirrors the Massachusetts statute upon which most anti-dilution statutes are apparently based. *See Restatement (Third) of Unfair Competition* § 25 cmt. b (1995). Chief Judge Carter has held that the interpretation given the Massachusetts statute by the First Circuit Court of Appeals in *Pignons S.A. de Mecanique v. Polaroid Corp.*, 657 F.2d 482, 494 (1st Cir.1981), should control analysis of the Maine statute, *see L.L. Bean v. Drake Publishers, Inc.*, 625 F.Supp. 1531, 1536 (D.Me.1986), and the First Circuit has chosen not to disturb or comment on that ruling. *See L.L. Bean v. Drake Publishers, Inc.*, 811 F.2d 26, 27 (1st Cir.), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). Under this interpretation there are three forms of trademark dilution: (1) confusion (which is controlled by the federal trademark infringement analysis); (2) effect on "goodwill and reputation associated with the plaintiff's mark"; and (3) "diminution in the uniqueness and individuality of the plaintiff's mark." *Pignons*, 657 F.2d at 494–95. I conclude that this dilution analysis entitles the plaintiff to no different relief than it obtains under its trademark infringement claim.

■ 8. Because Best Flavors registered and used its MISTIC marks extensively and nationally in the nonalcoholic beverage market well before Mystic Seaport Museum attempted to enter the soft drink industry, it is a prior user, entitled to priority for purposes of trademark law, with respect to the beverages it has sold. Moreover, because the soda line of beverages is a natural outgrowth of what Best Flavors has previously marketed, it also has priority with respect to the nonalcoholic line of beverages Mystic Seaport Museum is trying to market. Sodas in general "would be reasonably thought by the buying public to come from" MISTIC if sold under a "M*stic" mark. *See Standard Brands v. Smidler*, 151 F.2d 34, 37 (2d Cir.1945), *quoted in Artcraft Novelties v. Baxter Lane Co.*, 685 F.2d 988, 990–01 (5th Cir.1982). *See also Dwinell–Wright Co. v. National Fruit Prod.*

*Co.*, 140 F.2d 618, 622 (1st Cir.1944) (under previous statutory language dealing with "merchandise of substantially the same descriptive properties," business expansion doctrine applies where "the goods of the alleged infringer would be supposed by the kind of people who purchase them to emanate from the same source as the goods of the complainant"). The beverage market is simply not a natural outgrowth of Mystic Seaport Museum's previously registered and marketed products, and Mystic Seaport Museum must therefore enter the market subject to the priority trademark rights of Best Flavors.

9. Because alcoholic beverage sales are not within the natural outgrowth of the MIS-TIC trademarked products, on the other hand, Best Flavors has no such priority in that market.

10. Because I have found that there is a substantial likelihood of confusion among an appreciable number of ordinarily prudent purchasers in the nonalcoholic beverage market, the plaintiff is entitled to injunctive relief there.[8]

11. Because there is no substantial likelihood of confusion among an appreciable number of ordinarily prudent purchasers in the alcoholic beverage market, the plaintiff is not entitled to relief there.

### SCOPE OF RELIEF

1. Consistent with my Findings of Fact and Conclusions of Law, the defendants will be enjoined from using the current label on their lines of nonalcoholic root beer, ginger beer, spruce beer, birch beer, lemon beer and cream beer except as to product already in retailers' hands, which the plaintiff has agreed may be sold.

2. I have considered the defendants' arguments that they should be permitted to sell the product that is already manufactured and in the distributors' hands but not yet in the retailers' hands. The burden is on the defendants to persuade me that this reprieve

is appropriate. The defendants predict a loss of about $140,000 if such a sell off is not allowed because, they say, they cannot relabel the product economically and they believe its quality deteriorates after a shelf life of approximately three to six months. This is too large a quantity of beverage, however, to conclude that it will have negligible adverse impact on the plaintiff's marks if it is distributed. I will permit this existing product to be sold on Mystic Seaport Museum premises without relabeling because the likelihood of confusion there is nil. Otherwise, it may not be distributed under its current label.

3. No injunctive relief will be afforded as to the defendants' alcoholic product.

4. The plaintiff asks that I enjoin outright the use of "MYSTIC SEAPORT" in connection with beverages (now nonalcoholic beverages in light of my other rulings). I believe that such blanket relief is inappropriate, since the conclusion that confusion is likely is based upon a number of factors, including the type of beverage and the manner in which the mark is used on the current label. The defendants, on the other hand, would like me to tell them what changes they might make to avoid infringement, such as, they suggest, making the word "Seaport" equally prominent with "Mystic." That specific determination is also inappropriate, since I cannot determine in the abstract what the impact on the consumer would be, without seeing the mark in the context of the entire label and packaging.

5. The following comments may be helpful, however. As a judge who lives and works in New England, I find it difficult to set aside the assumption that Mystic Seaport Museum has wide name recognition in this region, minimizing the likelihood of confusion if the label's primary visual impact is "MYSTIC SEAPORT" rather than "M*STIC." In that sense, "MYSTIC SEAPORT" is itself a very strong mark with little likelihood of confusion. (I do not consider Mystic Seaport Museum's nonprofit status and educational

8. The First Circuit has also said that "when one adopts a mark similar to one already in use, there is an affirmative duty to avoid any likelihood of confusion." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir.

1987). That principle applies here; but to the extent that *Volkswagenwerk* implies extra burden on the defendant, it is not necessary to my decision.

mission relevant on this issue. If such an institution wishes to enter the commercial market, it must play by the same rules as any other entity.) Moreover, Mystic Seaport Museum is only attempting to benefit from the use of its own name, not to trade on the currency of the "MISTIC" mark. That may be a legitimate factor in determining the scope of an injunction. It is tempting, therefore, to conclude that the major element generating likely confusion here is the prominence of the word "Mystic" on the nonalcoholic beverage labels, based on type size, type face and location. That prominence could be reduced, perhaps eliminated, by requiring that "Mystic" and "Seaport" have equal prominence and that the two words stand side by side.

Although I was tempted to "craft" an injunction to "fit [these] facts," *see Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir.1993); *Jim Beam Brands Co. v. Beamish & Crawford, Ltd.*, 852 F.Supp. 196, 198 (S.D.N.Y.1994) ("equitable considerations may be considered in determining the scope of relief granted"); *Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp.*, 105 F.2d 908, 910 (2d Cir.1939) (L. Hand, J.) ("there can be no rule for all cases ... conflicting interests must always be weighed"), I ultimately decided against it for these reasons. First, there are undoubtedly large numbers of people within New England, New York and New Jersey who are unaware of Mystic Seaport Museum despite its renown. I cannot assume that they will never be exposed to MYSTIC SEAPORT beverages. Their focus will be the word "M*stic" on the label, they may ask for the beverage by sound, they may be unconcerned with spelling, and they are likely to assume that there is a relationship with MISTIC. Second, this region has an extensive tourist trade, with people visiting from other parts of the country who, despite the media attention, are much less likely to be acquainted with Mystic Seaport Museum. (This is not a term so key to our history, like Boston Tea Party, that I can take judicial notice that it is universally recognized, *see Jacobs v. International Multifoods Corp.*, 668 F.2d 1234 (C.C.P.A.1982)—itself an increasingly problematic assumption given illiteracy rates,

illegal immigrants, etc.) Therefore, even if Mystic Seaport Museum never extends its beverage marketing nationally, these visitors are likely to be confused as a result of their exposure here and carry that confusion back home with them where MISTIC is sold alone. Third, in trying to set aside the preconceptions I bring because of my own familiarity with the prominence of Mystic Seaport Museum, I have considered hypothetically other strong marks where a similar conflict might arise, but where I can evaluate it without preconceived expectations. In the beer market, for example, Miller Brewing Co. is a well known producer. If someone were to begin marketing "Myller Seaport" lager or stout, a strong likelihood of confusion seems inevitable given the lack of other significance to the name "Myller Seaport." (Other analogies are "Mychelob Seaport" alcoholic beverages, "Mychelin Seaport" tires, etc.) That same kind of confusion will affect those who know of MISTIC beverages but are not familiar with the Mystic Seaport Museum. *Cf. Chart House, Inc. v. Bornstein*, 636 F.2d 9, 11 (1st Cir.1980) (Chart House and Chart House Village too confusing); *President and Trustees of Colby College v. Colby College–New Hampshire*, 508 F.2d 804, 810–11 (1st Cir.1975) (actionable confusion between Colby College and Colby College–New Hampshire); *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 467 (N.D.Cal.1991) ("Consorzio del Gallo" likely to be confused with "Gallo").

In short, there may be a way to design a label that uses "MYSTIC SEAPORT" as the brand name for nonalcoholic beverages, but I am skeptical. On the other hand, marketing people can be very creative and it is not for me, therefore, to foreclose all possibility. (The plaintiff has conceded that "MYSTIC SEAPORT" can appear on the bottle as a place of origin so long as it is not the name of the brand and is duly minimized in prominence.

6. At closing argument, the plaintiff's lawyer asked me to enjoin the use of "Mystic River" by the defendant Mystic River Brewing Co. That is an issue that was not otherwise presented in the case from the plead-

ings onward and I consider it therefore outside the scope of this lawsuit.

The plaintiff's lawyer shall prepare a final injunction that reflects the relief I have awarded, submit it to the defendants' lawyer for review on both form and compliance with the relief I have awarded and then submit it to the Court. Neither party thereby waives any right to object to or appeal the substance of my decision, but each does respectively waive any objections as to the form of the injunction and as to whether the injunction complies with this decision.

So ORDERED.