Anheuser-Busch v. Caught-on-Blue        CV-02-196-JD   10/09/03   P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Anheuser-Busch, Inc.

v.                                          Civil No. 02-196-JD
                                            Opinion No. 2003 DNH 173
Caught-on-Bleu, Inc.

O R D E R


Anheuser-Busch, Inc. ("A-B") has sued Caught-on-Bleu, Inc. ("C-O-B") for trademark infringement, trademark dilution, and unfair competition under the Trademark Act of 1946, 15 U.S.C. §§ 1051-1127 ("the Lanham Act"), for trademark dilution under New Hampshire Revised Statutes Annotated ("RSA") 350-A:12, and for trademark infringement and unfair competition under common law. A-B moves for summary judgment on its claims for trademark infringement under Section 32 of the Lanham Act,[1] 15 U.S.C. § 1114(1) (count one), unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (count two), and for dilution under RSA 350-A:12 (count four) (document no. 44).[2] C-O-B objects (document no. 57).

---

[1]In its motion for summary judgment, A-B erroneously references section 35 of the Lanham Act, instead of section 32, as the basis of its trademark infringement claim.

[2]A-B does not move for summary judgment on its claim for federal trademark dilution in violation of 15 U.S.C. § 1125(c) (count three), nor on its claim of common law trademark infringement and unfair competition (count five).

        A. A-B's "Bud" Trademarks

        A-B and its predecessors have brewed and marketed beer in the United States under the trademark "Budweiser" since 1876. Within a few years of the beer's introduction, the public came to refer to it as "Bud." As early as the 1930s, A-B began using the name "Bud" to market Budweiser, beginning by placing the word on beer taps distributed to bars and later incorporating other methods. A-B has capitalized on the Bud mark by creating a "family" of beers over time which use "Bud" in their names, including "Bud Light," "Bud Dry," and "Bud Ice."

        The Budweiser mark has been federally registered since 1878 and is owned by A-B under United States Trademark Registration number 922,481 for beer, and number 952,277 for beer and malt liquor. Some of A-B's other federally registered trademarks for beer include "Bud," "Bud Man," "Bud Light," "Bud Bowl," "Bud Dry," and "Bud Ice."[4] A-B sold more than 400 million barrels of

---

[3]Only A-B has provided a factual statement as required by Local Rule 7.2(b). All properly supported facts submitted by A-B are consequently deemed admitted for purposes of summary judgment. See LR 7.2(b)(2). To the extent that C-O-B has stated contrary facts in its objection and supported those facts with precise citation to the record, the court will consider such facts to be in dispute.

[4]The term "Bud mark," as used herein, refers to any of A-B's marks which include the word "Bud."

beer under the Bud mark between 1996 and 2002, achieving more than $40 billion in sales. Bud Light and Budweiser have been the two best-selling brands of beer in the United States since 1994. These beers are sold to bars, restaurants, and package, grocery, and convenience stores in every state.

Both Budweiser and Bud Light bottles have labels with a scroll, seal, and field presented against a red background. These elements and the outline of the label itself appear in white on a Budweiser bottle and in silver on a Bud Light bottle. Budweiser bottles use blue cursive to set out the name of the beer, while those of Bud Light use blue block capitals outlined in white and red. Budweiser and Bud Light cans use designs similar to those of the bottles: Budweiser cans are white with a red frame around the scroll, seal, and a white field with blue cursive lettering, while Bud Light cans feature the beer's name in blue block capitals against a silver field and a silver scroll and seal with blue lettering against a red background. Many of A-B's promotional products are red in color with white lettering spelling out the name of one of the Bud marks.

A-B has extensively promoted the Bud mark in connection with its beers, spending more than $1 billion in advertising those products between 1999 and 2002 alone. The mark has been featured in thousands of television and radio commercials and print

3

advertisements, as well as on billboards, race cars, and an airship.  A-B has used the word "Bud" in slogans like "Nothing Beats a Bud," "This Bud's for You," and "Make it a Bud Light." The Bud marks also appear on a wide range of merchandise, including clothing, sporting goods, and glassware.  These items are available through a mail order catalog at 1-800-PICK BUD (also a registered A-B mark) and online at <*www.BudShop.com*>.

Elaborate advertising campaigns have centered around the Bud mark, including the "Bud Bowl" in which Budweiser and Bud Light teams comprised of beer cans and bottles play a football game over the course of commercial breaks before, during, or after the Super Bowl.  The Bud Bowl began in 1989, and has been promoted over the years through print advertisements, point-of-sale displays, and an official website.  A-B has gone so far as to anoint some of the Bud Bowl players with names, including "Billy Bud," a star running back.

B. COB's "Billy Budd" Mark

It was a dark and stormy night in November 1995 when COB's president, Lisamarie Sapuppo-Bertrand, first thought of naming a product after Billy Budd, the title character from Herman Melville's posthumously published and unfinished work Billy Budd, Sailor (An Inside Narrative).  Sapuppo-Bertrand shared her

4

thought with Bernice Keeney, C-O-B's vice president, during a conversation that night about, inter alia, the labels of products like wine and salad dressing. Impressed by "Billy Budd" as a "manly name," the two considered it as a brand name for shampoo, cologne, and "maybe several other products" before deciding to use it for a beer. Keeney Dep. at 51-52. At that time, Keeney was aware that A-B used the Bud mark in connection with beer.

Nearly two years later, on October 28, 1997, C-O-B's predecessor-in-interest applied to register a "Billy Budd" mark with the United States Patent and Trademark Office. The application described the design as a "sailor steering a ship on a stormy sea as seen through a portal." The words "Billy Budd," which the application stated as the "name of [the] product," appeared across the top of the portal in cursive lettering, while "Classic American Ale," described as a subheading, appeared in a smaller version of the same font on a ribbon across the bottom. Below the ribbon was an eagle with outstretched wings. A rectangular box enclosed the entire design.

Although "Beers" and a number of nonalcoholic beverages were listed as the goods to be covered by the mark, C-O-B amended that section of the application on September 11, 1998, to list only "Beers." In a subsequent amendment, submitted by telephone on April 5, 1999, the word "Beers" was changed to "ALES." The

5

September, 1998, amendment also detailed the mark's design more fully, describing the ribbon as red and the color of the mark as "shaded blue from the top to the center and gradually shad[ing] into a light brown . . . at the bottom of the mark."  A-B opposed C-O-B's trademark application.

In September 1999, C-O-B contracted with New Hampshire Custom Brewers, Inc. ("NHCB") to produce "Billy Budd Classic American Ale" and to distribute it in New Hampshire.[5]  Pursuant to the contract, NHCB later submitted an application to the Bureau of Alcohol, Tobacco, and Firearms ("ATF") for approval of a label to be placed on kegs of the product.  The application presented the label as black and white, with "Billy Budd Classic American Ale" written across the top in capitalized, underlined block lettering.  The words "1-877-488-BUDD" and "www.billybudd.com," respectively, were written in the upper left and upper right corners of the rectangular label.[6]  Apart from NHCB's seal and name and address, the label contained no other information identifying its source.

Later in the fall of 1999, NHCB manufactured twenty-five

---

[5]The agreement also covered another C-O-B product, "Boston Bluebeard Golden Amber Ale," which has never been produced and is not at issue here.

[6]This telephone number was never activated.

6

barrels of Billy Budd Classic American Ale.  Each keg was marked in two different places with the label which had been approved by the ATF, in addition to another sticker and a plastic cap on top which said "Billy Budd Classic American Ale."  Per instructions from C-O-B, on October 8, 1999, NHCB delivered one keg of the beer to both Red Coach Inn and Hillwinds Restaurant and Lodge in Franconia, and another to Fabyan's Station Restaurant and Lounge in Bretton Woods for seventy-five dollars each.  At some point, Duffy's Tavern in Manchester also purchased a keg.  Two more kegs were delivered to the New Hampshire College Alumni Association for consumption at a "Microbrew Fest" on October 16, 1999.[7] Fabyan's carries Budweiser on tap, as well as a number of other A-B brews (including Bud Light) in bottles.  Duffy's carries Bud and Bud Light, but it is unclear in what form.

Everyone who received a keg of Billy Budd Classic American Ale also received an accompanying tap handle.  The handle was in the shape of a tapered cylinder, widest near the top, and blue in color.  Attached to each handle was a flat, oval-shaped sign with the words "Billy Budd" in red cursive lettering (similar to that from C-O-B's trademark application) against a white background. An anchor, drawn in black and white, appeared between the words "Billy" and "Budd," which were arranged vertically, one atop the

---

[7]The alumni association was not charged for these kegs.

other.  The "i" in "Billy" was dotted in blue, rather than red.
At Fabyan's, the "Billy Budd" tap handle was placed in a display
behind the bar with seven other handles which serves to inform
customers of the available draft beers.  At both Fabyan's and
Duffy's, patrons can discern the available brands of draft beer
only by seeing the tap handles or asking a server.

NHCB described Billy Budd Classic American Ale to its
customers as a "bountiful blend of traditionally brewed light,
dark, roasted and crystal malts, with a full-bodied English First
Gold hop for a spriteful, yet shameless, flavor, not likely to be
forgotten."  In terms more easily understood by the average
person, Larry Bowse, NHCB's general manager at the time the beer
was produced, described it as "dark" and "different."

In approximately the fall of 1999, C-O-B launched a website
at the www.billybudd.com address which had appeared on the Billy
Budd Classic American Ale keg labels.  The site consisted of a
single page with the words "Caught-on-Bleu, Inc. presents"
written in an italicized font above two side-by-side renditions
of the Billy Budd Classic American Ale design in the form in
which it had appeared on C-O-B's trademark application.  "Billy
Budd" was written in white with a red outline, while "Classic
American Ale" appeared in white against the red background of the
ribbon (as described in the trademark application).  The box

which enclosed the mark was shaded from blue on the top into red on the bottom.[8]  The phrase "the legend lives on" appeared in an italicized script in the middle of the page.  Below that was a drawing of a pirate in a pose similar to that of the sailor in the Billy Budd Classic American Ale mark, but without the portal and with the words "Boston Bluebeard" written across the top and "Golden Amber Ale" written across the bottom on a ribbon.  The statement "Billy Budd Classic American Ale and Boston Bluebeard Golden Amber Ale are pending trademark registrations of Caught-on-Bleu, Inc." was written across the very bottom of the page.

The www.billybud.com site, however, did not expressly mention any beer.  Instead, it solicited orders for "Promotional Sale Items," including white cotton T-shirts and magnets, to be faxed to a local New Hampshire number.[9]  C-O-B produced a number of shirts, the fronts of which bore the Billy Budd Classic American Ale design shown on the site, while on the back the words "the Legend lives on... can't keep a good man down!" and "www.billybudd.com" and "1-877-GO-4-BUDD" appeared.  Red hats with "Billy Budd" and "Classic American Ale" in white lettering

---

[8]Keeney described one of the two designs as having "slightly different colors."  There is no evidence in the record, however, as to what those colors were, and no merchandise bearing that version of the mark was ever created.

[9]The magnets were never manufactured.

in the same font used in the trademark application (with the latter phrase appearing on a red ribbon in the same shape as that on the application) were also made. None of these items was ever sold, although a single hat was given to a friend of Keeney's father. C-O-B discontinued the website in March 2001. Other than the hats and T-shirts, C-O-B has never produced any advertising or promotional materials for the Billy Budd mark.

NHCB stopped brewing Billy Budd Classic American Ale in early November 1999, in response to the threat of an injunction from A-B.[10] In the late spring and early summer of 2000, C-O-B attempted to interest other brewers in producing the beer but was ultimately unsuccessful. As a result, the only sales of the product to date were those to the bars already discussed.[11] C-O-B nevertheless plans to produce Billy Budd Classic American Ale "sometime in the future" and to distribute it to "bed and breakfasts, [and] a little more upper class restaurants" as well as to bars and taverns, and to package and convenience stores. Keeney Dep. at 85-87.

---

[10]A-B's contact with NHCB was the basis of C-O-B's counterclaim in this action for tortious interference. This court granted summary judgment in A-B's favor on that and C-O-B's other counterclaims in an order of July 22, 2003.

[11]With C-O-B's authorization, NHCB destroyed the remaining kegs of Billy Budd Classic American Ale when they reached their "past prime date" in early February 2000.

10

## Standard of Review

"'While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so.'" <u>Boston Athletic Ass'n v. Sullivan</u>, 867 F.2d 22, 24 (1st Cir. 1989) (quoting <u>Kazmaier v. Wooten</u>, 761 F.2d 46, 48-49 (1st Cir. 1985)). Summary judgment is appropriate "in a trademark infringement case in this circuit . . . 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d 812, 815 (1st Cir. 1987) (quoting <u>Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.</u>, 718 F.2d 1201, 1204 (1st Cir. 1983) (further internal citation and quotation omitted)); <u>see also</u> Fed. R. Civ. P. 56(c).

The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "A factual dispute is material if it 'affects the outcome of the litigation,' and genuine if manifested by 'substantial' evidence 'going beyond the allegations of the complaint.'" <u>Astra</u>, 718 F.2d at 1204 (quoting <u>Pignons S.A. de Mecanique de Precision v.</u>

Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981)); Fed. R. Civ. P. 56(c)). A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

## Discussion

### I. Lanham Act Trademark Infringement and Unfair Competition

Counts one and two of A-B's complaint assert trademark infringement and unfair competition in violation of the Lanham Act. The Act protects both the public and the owner of a trademark by "prevent[ing] the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service." Star Fin. Servs., Inc. v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996); see also I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998); Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir. 1996). Likelihood of confusion is the "key question" for both of A-B's Lanham Act claims. See Bird v. Parsons, 289 F.3d 865, 877 (6th Cir. 2002); compare 15 U.S.C. § 1125(a)(1) (defining unfair competition as use of "any word, term, name, symbol, or device, . . . likely to cause confusion") with 15 U.S.C. § 1114(1) (defining trademark infringement as "use

12

. . . of any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . . likely to cause confusion") (emphasis added).

"To win a trademark case, a plaintiff must show 1) that he uses, and thereby 'owns,' a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir. 1992); see also Int'l Ass'n of Machinists, 103 F.3d at 200 & n.5. C-O-B does not dispute its use of the Billy Budd mark or A-B's ownership of the Bud mark. Accordingly, the success of A-B's summary judgment motion as to its Lanham Act claims depends on the absence of a disputed issue of fact which is material to the likelihood of confusion between the two marks.

"[T]he likelihood of confusion inquiry centers on whether members of the purchasing public are likely to mistake defendant['s] products . . . for plaintiff['s] protected products . . . within the same category." Boston Athletic Ass'n, 867 F.2d at 28. Whether an allegedly infringing mark is likely to cause confusion is a question of fact, determined by assessing eight factors, no single one of which is conclusive. See Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 3-4 (1st Cir. 1993); Kappa Sigma Fraternity v. Kappa Sigma Gamma

13

Fraternity, 654 F. Supp. 1095, 1101 (D.N.H. 1987). The eight factors are: "(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark." Volkswagenwerk, 814 F.2d at 817; see also Boston Athletic Ass'n, 867 F.2d at 29.

In weighing the factors, "[n]o one factor is necessarily determinative, but each must be considered" by the court in assessing the factors "on the whole." Volkswagenwerk, 814 F.2d at 817. They "must be evaluated in context, [and] any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark." Int'l Ass'n of Machinists, 103 F.3d at 201.

In claiming that C-O-B's mark infringes a number of different marks which include the word "Bud," A-B is invoking the "family of marks" doctrine. See generally 3 McCarthy § 23:61. A family of marks is "a group of marks having a recognizable common characteristic . . . [so] that the public associates not only the individual marks, but the common characteristic of the family,

14

with the trademark owner." J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 1462 (Fed. Cir. 1991) (ruling that McDonald's has established a family of marks in product names starting with the prefix "Mc"). C-O-B does not dispute that A-B has established a family of marks with "Bud" as the common element. Accordingly, the court will compare C-O-B's mark to A-B's family of "Bud" marks when applying the likelihood of confusion factors.

A.    Similarity of the Marks

Similarity may be found in the "sound, appearance, and meaning" of words within marks. Volkswagenwerk, 814 F.2d at 817; see also PACCAR Inc. v. TeleScan Techs., L.L.C., 319 F.3d 243, 252 (6th Cir. 2003); Restatement (Third) Unfair Competition § 21(a) (1995). Marks are to be assessed "on the basis of the total effect of the designation, rather than a comparison of individual features." Pignons, 657 F.2d at 487 (internal quotation omitted); see also Best Flavors, Inc. v. Mystic River Brewing Co., 886 F. Supp. 908, 913 (D. Me. 1995). Marks should not be simply compared side-by-side, but "in light of what occurs in the marketplace, taking into account the 'circumstances surrounding the purchase of the goods. . . .'" Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 44 (D. Mass. 1995) (quoting

15

<u>Calamari Fisheries, Inc. v. Village Catch, Inc.</u>, 698 F. Supp. 994, 1009 (D. Mass. 1988)); <u>see also</u> <u>PACCAR</u>, 319 F.3d at 252; <u>Best Flavors</u>, 886 F. Supp. at 913.

It is undisputed that "Bud" and "Billy Budd" sound alike. In fact, C-O-B's vice president has acknowledged that "if somebody says out loud Billy Budd there's no way for someone listening to know whether or not they mean it with two Ds or with one D . . . ." Keeney Dep. at 98-99. Keeney has also acknowledged that bar and restaurant patrons generally order their beer by name. Indeed, one of the only two ways for a customer at Fabyan's or Duffy's (two of the four establishments at which Billy Budd Classic American Ale has been sold) to find out what brews are available on draft is to ask a server to relate that information verbally. Under these circumstances, the similarity in sound between "Bud" and "Billy Budd" becomes "particularly important." 3 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 23:22 (4th ed. 2002); <u>see also</u> <u>Krim-Ko Corp. v. Coca-Cola Bottling Co.</u>, 390 F.2d 728, 731-32 (C.C.P.A. 1968) (confusion likely between sound-alike marks for soft drinks, "which may frequently be purchased by the spoken word"). Thus, the similarity in sound between the names of the marks indicates a likelihood of confusion. <u>See</u> <u>Beck & Co. v. Package Distribs. of Am., Inc.</u>, 198 U.S.P.Q. 573, 577 (T.T.A.B.

16

1978) (finding likelihood of confusion between "Beck's Beer" and "Ex Bier" based on similar sound).

C-O-B argues that the placement of the word "Billy" to precede "Budd" sufficiently distinguishes its mark from A-B's marks, many of which use "Bud" in conjunction with a second word which follows, as in "Bud Light." This argument is unpersuasive. As an initial matter, A-B's marketing has not used the word "Bud" solely in product names in which it was followed by another word, but has extensively employed it on its own to refer to Budweiser since the 1930s, including its use as a part of slogans ending in "Bud."[12] The American public has also used the word "Bud" alone to refer to A-B's beer since the late 19th century--a fact which was considered long-established nearly sixty-five years ago. See Anheuser-Busch, Inc. v. Power City Brewery, Inc., 28 F. Supp. 740, 742 (W.D.N.Y. 1939).

Secondly, C-O-B itself had used "Budd" without the "Billy" to refer to its beer, as part of the phone number printed on its keg labels and T-shirts. C-O-B also regularly omitted "Classic American Ale" when referring to its product, most prominently on

---

[12]A-B also points out that it has used a character named "Billy Bud" to promote its products through its popular Bud Bowl ad campaign.

17

the tap handles.[13]  In light of these undisputed facts, the placement of "Billy" before "Budd," or "Classic American Ale" after "Budd," in C-O-B's mark does not diminish the likelihood of confusion the name creates with respect to A-B.  See Best Flavors, 886 F. Supp. at 913-14 (likelihood of confusion caused by use of soda bottles labeled "Mystic Seaport" in face of plaintiff's use of "Royal Mistic" to describe line of similar products); Power City, 28 F. Supp. at 743 (likelihood of confusion between "Bud" and "Niagra Bud" as names for beer).

The appearance of the two marks also weighs in favor of a likelihood of confusion.  Budweiser and Bud Light labels have blue lettering and white or silver elements against a red background, while C-O-B used white lettering with a red outline or against a red background to spell out "Billy Budd" on both the tap handles which accompanied in its kegs and the T-shirts and hats for sale on its website.[14]  A number of A-B's promotional goods also feature white script setting out the name of the Bud mark against a red background, including Dale Earnhardt, Jr.'s

---

[13]In any event, because the phrase "Classic American Ale" is merely a descriptive element, its addition to the mark is insufficient to avoid confusion.  See 3 McCarthy § 23:50.

[14]In addition, the tap handles themselves were blue, a color prominent on Bud Light labels.

18

Winston Cup series car, the Bud One airship, and much of the clothing and other items offered through A-B's catalog and website. In addition, both the word "Budweiser" as it appears on cans and bottles and the words "Billy Budd" as they appear on C-O-B's tap handles and trademark application (and consequently the website and related merchandise) appear in looping cursive. These undisputed facts all point to the conclusion that the parties' marks are similar in appearance.

C-O-B raises a number of arguments to the contrary. First, it asserts that the labels on its kegs make "clear that this was a non A-B product," because they indicate that Billy Budd Classic American Ale is brewed by NHCB rather than A-B. Confusion, however, necessarily depends on the context where consumers themselves will encounter the mark in question. See Int'l Ass'n of Machinists, 103 F.3d at 201. There is no evidence that most beer drinkers would ever see the label on a keg of Billy Budd Classic American Ale.[15] In any event, even if they did, the label raises as many questions as it answers as to the source of the keg, because it includes a telephone number with the word

_____

[15]C-O-B concedes in its memorandum that "the beer-consuming public" is "the relevant consumer group in this case." The court will therefore assess confusion among the consumer, rather than the retailer, class. See 3 McCarthy § 23:100.

19

"BUDD" in it.

Furthermore, even if the labels made clear that NHCB--and not A-B--was the source of Billy Budd Classic American Ale, confusion would linger as to whether the product was nevertheless affiliated with A-B. Use of a mark likely to confuse the public as to the user's affiliation with the senior holder violates the Lanham Act, even in the absence of a likelihood of confusion as to source. See 15 U.S.C. § 1125(a). The keg labels do not decrease the likelihood of confusion caused by C-O-B's use of the Billy Budd mark as a whole.

C-O-B also argues that its mark employs "a completely nautical theme . . . not evident on any [A-B] products." The theme finds its primary expression in the artwork submitted as part of C-O-B's trademark application and later displayed on its website and T-shirts, which shows a "sailor steering a ship on a stormy sea as seen through a portal," as well as the anchor which appeared between the words "Billy" and "Budd" on the tap handles.[16] Based on the evidence submitted, C-O-B is correct

[16]In its memorandum, C-O-B claims that the tap handles distributed with the kegs were used only because of the manufacturer's delay in producing the handles C-O-B actually wanted, which would have included the phrase "Classic American Ale" and markings "to look more like a ship's wheel rather than a simple circular design." C-O-B has not submitted any evidence of

that A-B has never used a nautical theme to market its beers. Its argument fails, however, because C-O-B itself made only minimal use of a nautical theme in promoting its product.

C-O-B's commercial use of the depiction of the sailor was limited to its website, which did not even make clear that Billy Budd Classic American Ale existed apart from the promotional materials offered for sale. Indeed, Boston Bluebeard Golden Amber Ale, also mentioned by name in artwork shown on the site, has yet to be brewed. None of the T-shirts featuring the artwork was ever sold. Thus, the only way in which a consumer could have encountered the "nautical theme" was through the anchor depicted on the tap handles and the name of the product itself.[17]

_____

this claim, however. Sapuppo-Bertrand's declaration merely refers to the "full BILLY BUDD CLASSIC AMERICAN ALE TAP HANDLE," without describing it. While C-O-B also relies on a page from a tap handle catalog where one of the handles has been circled and marked with what look like spokes of a ship's wheel, Keeney's deposition testimony identifies a different handle on the page as the one C-O-B ordered, and Sappupo-Bertrand's declaration does not refer to the document at all. Keeney also described as "plain" the "kind of design [which] would have been put on [the] keg handles" for which the manufacturer provided a price quote. The record contains no properly submitted evidence of C-O-B's intent to use a tap handle of the design described in its memorandum.

[17]In its memorandum, C-O-B claims that "any bottle production" would have included labels boasting the image of the sailor, but does not refer to any record evidence to this effect. Instead, C-O-B cites a document consisting of a number of

C-O-B has failed to come forward with any proof that consumers associate the phrase "Billy Budd" with the sailor in Melville's work of the same name. Furthermore, because the anchor on the tap handles was surrounded by the words "Billy Budd" in red cursive lettering on a white background, the tap handle still resembles the Bud mark despite the inclusion of the nautical symbol. See Power City, 28 F. Supp. at 743 (use of picture of rosebud on "Niagra Bud" tap handle to convey floral meaning "adds nothing" to distinguish it from "Bud"). C-O-B's minimal use of the nautical theme is not sufficient to distinguish its mark from those of A-B.

The similarity in sound and appearance between C-O-B's Billy Budd Classic American Ale mark and the Bud mark weigh in favor of a likelihood of confusion.

B.    Similarity of the Goods

It is undisputed that the Billy Budd Classic American Ale mark and the Bud mark have both been used to promote beer, and that C-O-B intends to continue using its mark to promote beer.

_____

differently colored versions of the artwork, which it represents as the "bottle labels produced" at Keeney's deposition. In the absence of any explanatory testimony, however, this document has no evidentiary value.

22

C-O-B contends, however, that "the similarities end there," because its product is classified as an ale, while "A-B has always viewed itself as a producer of lagers . . . ." This argument does not tip this factor in C-O-B's favor.

As an initial matter, C-O-B has not provided any support for its characterization of A-B's current self-image. Although A-B's earliest registered trademarks were for "lager-beer," that designation had changed to "beer" alone by 1907. Similarly, while the Budweiser mark as registered in 1886, 1878, and 1969 included the phrase "lager beer," the phrase does not appear on the current labels of Budweiser, Bud Light, Bud Dry, Bud Ice, or Bud Ice Light, all of which include the word "Beer." Nor has C-O-B come forward with any evidence that consumers recognize any of the beers in the Bud family as lagers, rather than simply as beers. On this record, it is undisputed that the class of goods covered by the Bud mark consists, simply, of beer.

C-O-B also has not submitted any proof that consumers would recognize its product as an ale, rather than as simply a beer. In its memorandum, C-O-B purports to explain the distinction between lager and ale, which includes differences in "the look of the beer in a consumer's glass." There is insufficient record evidence, however, as to the appearance of either C-O-B's product

23

or any of the various brews sold under the Bud mark.  Nor is there evidence of consumer awareness as to the allegedly different "look" of ale and lager.  Moreover, although the full name of C-O-B's product identifies it as an ale, that description was regularly omitted from the company's own references to its brew and is likely to be dropped by retailers and consumers alike in communicating orders for it in a bar or restaurant.  Accordingly, there is no evidence to support C-O-B's position that consumers would recognize its product as an ale and thereby distinguish it from the beers sold under the Bud mark.

Even if C-O-B could demonstrate a triable issue as to whether consumers recognize the difference between the ale sold under the Billy Budd Classic American Ale mark and the lagers sold under the Bud mark, the undisputed fact that ales and lagers are both beers makes them similar goods for purposes of the likelihood of confusion analysis.  Products sold under similar marks need not be identical to engender confusion.  See, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 159 (9th Cir. 1963) (confusion between beer and scotch whiskey); Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc., 64 U.S.P.Q.2d 1039, 1043 (S.D.N.Y. 2002) (same); Best Flavors, 886 F. Supp. at 914 ("all chilled nonalcoholic

24

beverages, other than perhaps milk, are closely related for many beverage purchasing decisions. . . .”); <u>Arthur Guinness, Son & Co. v. Oscar Von Bernuth, Inc.</u>, 14 F. Supp. 210, 211-12 (S.D.N.Y. 1923) (confusion between stout and nonalcoholic malt beverage); <u>Beck</u>, 198 U.S.P.Q. at 577 (same).

The Lanham Act “gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to have come from the same source . . . .” 4 McCarthy § 24:6. There is no dispute that the buying public would reasonably think that an ale and a lager came from the same source. The similarity of the parties’ goods weighs in favor of a likelihood of confusion.

C.   <u>Relationship Between The Parties’ Advertising, Channels of Trade, and Classes of Prospective Purchasers</u>

In the First Circuit, the factors of the relationship between the parties’ channels of trade and advertising and the classes of prospective purchasers are generally considered together. <u>Boston Athletic Ass’n</u>, 867 F.2d at 29; <u>Volkswagenwerk</u>, 814 F.2d at 818.

A-B sells products under the Bud mark to bars, restaurants, and package, grocery, and convenience stores in every state.

25

C-O-B has sold Billy Budd Classic American Ale to bars and restaurants in New Hampshire and intends to make future sales to bars and restaurants and convenience stores in New Hampshire and possibly beyond. The products sold under the parties' marks, then, share nearly identical channels of trade. In fact, two of the four establishments which purchased C-O-B's product also sell products under the Bud mark.

C-O-B contends that the parties' channels of trade differ in that "BUDWEISER is delivered via 'A-B' distributors, who are well known for their total commitment to [A-B] products." C-O-B's evidence of this proposition consists of an unidentified photograph of a parked van bearing some of the Bud marks and a page apparently printed from the website of "Clarke Distributors Inc [*sic*]" which contains the marks and descriptions of a number of A-B products. These materials are without evidentiary value.[18] See Fed. R. Civ. P. 56(e). In any event, C-O-B's argument misses the point of examining channels of trade as part of the likelihood of confusion analysis. This part of the

_____

[18]C-O-B also submitted a page from the deposition of William Gannon, who apparently acted as counsel to NHCB during its bankruptcy, where he testified that he uses the phrase "AB [*sic*] distributors" to mean "distributors whose principal products were [A-B] products." This evidence does not establish anything other than how Gannon uses the phrase "A-B distributors."

inquiry seeks to gauge the extent to which consumers might encounter the parties' products in the same context and therefore confuse them. There is no evidence that beer consumers would know or care whether products for sale at a retail outlet came from different distributors. Consequently, there is no evidence that the distinction helps the consumer class in distinguishing one product from another.[19] The fact that distributors who carry Bud brands would not carry Billy Budd Classic American Ale, then, has no bearing on the likelihood of confusion analysis.

C-O-B attempted to advertise Billy Budd American Ale through the promotional T-shirts available on its website, through hats bearing the name of the product, and through the 1-877-GO4-BUDD (or 1-877-488-BUDD) number printed on the T-shirts and keg labels. A-B uses methods similar to these, and a host of others, in advertising its Bud marks. It sells a variety of T-shirts, hats, and other merchandise featuring the Bud marks over its own website and through its own toll free number, 1-800-PICK BUD. The parties thus use similar advertising, including the nearly

---

[19]C-O-B's claim that "[d]istributors routinely place microbrews apart from A-B products at the retail level" arguably has some relevance to the likelihood of confusion inquiry, but is unsupported by any evidence, save a photograph of an unidentified supermarket aisle which shows A-B products shelved together. This does not create an issue of fact.

identical 1-877-GO4-BUDD and 1-800-PICK BUD numbers.

C-O-B suggests that the national scope of A-B's advertising actually works to differentiate the Bud products from Billy Budd Classic American Ale, because "if it was [*sic*] an A-B product or related to BUDWEISER in any way, consumers would have an expectation that the brand would be nationally advertised." While C-O-B's assumption may be reasonable, it does not necessarily follow that a consumer coming across any of the Billy Budd promotional materials--or the product itself--would rule out A-B as the source of the product simply because he or she had not seen any national advertising for the brew. A beer drinker might attribute the lack of national advertising to the relative newness or limited seasonal availability of the product, or a conscious attempt to target a particular regional market. In the absence of any record evidence to the contrary, the inference which C-O-B asks the court to draw from the lack of national advertising for Billy Budd is not reasonable.

C-O-B's memorandum acknowledges that "the beer-consuming public" comprises the class of prospective purchasers for both its product and those of A-B. Nevertheless, C-O-B disputes any likelihood of confusion based on this identical class of prospective purchasers, asserting that its product appeals to

28

"microbrew or craft beer drinkers" while A-B's products do not. C-O-B does not submit any market studies which support its division of the "beer-consuming" public into two mutually exclusive categories. The testimony of NHCB's former manager that "[p]eople who you talk to who drink Budweiser wouldn't dare think of drinking a micro beer and the people who drink micro beers wouldn't dare think of drinking a Budweiser" is not sufficient to defeat summary judgment.[20] Bowse Dep. at 117.

In a related vein, C-O-B suggests that Billy Budd American Ale appeals to "those beer drinkers who discriminate in their purchasing habits," while Bud products are consumed by "those beer drinkers that order the same brand every time." It is true that the likelihood of confusion between two goods decreases when consumers engage in careful consideration before making a purchase. See Pignons, 657 F.2d at 489; Best Flavors, 886 F. Supp. at 916. There is no evidence, however, that beer is the kind of product which inspires deliberation in purchasing decisions. The deposition testimony of Fabyan's manager that its customers "almost always" ask "a question or two" before ordering "a beer they haven't seen before" does not support C-O-B's

---

[20]The same is true of the testimony of Jane Lynch, the manager of Duffy's, to which C-O-B refers in its memorandum.

theory. Marcum Dep. at 28. "[A] question or two" is not careful consideration, and the testimony deals only with new beers, not necessarily microbrews.

C-O-B also asserts that "relatively speaking, a microbrew beer is expensive compared to a BUDWEISER or a BUD LIGHT," and that would-be Billy Budd Classic American Ale drinkers are thus distinguished from those who drink A-B's products. A disparity in price between the products in question can serve to demonstrate that they travel in different channels or target different classes of customers. See 4 McCarthy § 24:52. While kegs of Billy Budd Classic American Ale were sold to retailers for $75 each, there is no evidence as to the prices of any Bud product at wholesale, or as to the price of either product to the consumer. Nor is there any evidence of what, if any, role price plays in a drinker's decision as to which beer to purchase. Cf. E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 465 (N.D. Cal. 1991) (finding that wines are "relatively inexpensive, 'impulse' products to which the average, 'unsophisticated' consumer does not devote a great deal of care and consideration in purchasing"). C-O-B has failed to show any issue of fact material to the court's consideration of the relevant class of consumers.

Based on the summary judgment record, the parties' channels of trade, advertising, and classes of prospective purchasers all weigh in favor of a likelihood of confusion.

D.    Evidence of Actual Confusion

    "Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion." Copy Cop, 908 F. Supp. at 45. Nevertheless, a "showing of actual confusion is not essential in order to find a likelihood of confusion." Volkswagenwerk, 814 F.2d at 818. Consumer survey evidence is often used to demonstrate actual confusion in trademark infringement cases.[21] See Boston Athletic Ass'n, 867 F.2d at 31-32 & n.9; Copy Cop, 908 F. Supp. at 46.

    To be relevant, a consumer survey must measure confusion in

---

[21]In evaluating the actual confusion caused by C-O-B's mark, the court has considered only A-B's survey evidence and C-O-B's response to it.  A-B's other evidence of actual confusion consists primarily of the actions of NHCB in requiring an indemnification provision in its license agreement with C-O-B and mentioning A-B's objection to the registration of the mark as a "Litigation Risk" in its reorganization plan.  A-B does not explain how these actions show actual confusion between the marks, and that proposition is not apparent to the court.  A-B also cites Marcum's self-described "impression" of C-O-B's mark that "you see the name Bud and people go I'll try that," which is merely his opinion as to a likelihood of confusion.  Marcum Dep. at 13.  The court concludes that there is no record evidence of actual confusion apart from the survey.

"the potential buyers of the junior user's goods and services." 5 McCarthy § 32:159; see also Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 118 (2d Cir. 1984). A survey need not demonstrate that all consumers, or even a majority of them, would actually be confused. See, e.g., Mut. of Omaha Ins. Co. v. Novak, 836 F.2d 397, 400-01 (8th Cir. 1987) (survey showing 10-12% confusion sufficient); RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1061 (2d Cir. 1979) (15-20% confusion sufficient); Exxon Corp. v. Tex. Motor Exch., Inc., 628 F.2d 500, 507 (5th Cir. 1980) (15% confusion sufficient).

A-B has submitted a survey which found "a substantial likelihood of source confusion" between A-B and C-O-B based on the use of the Billy Budd mark. The survey, conducted by Walter McCullough of Monroe Mendelsohn Research, revealed that a total of twenty-four percent of consumers who were shown a tap handle identical to that distributed with the kegs of C-O-B's product believed that A-B put out the product or was affiliated or connected with, or had given permission to, whomever did. The survey was conducted by interviewing adult shoppers in five different malls throughout New England who had either ordered micro brewed beer or ale in a bar or restaurant "during the past year or so" or believed that they might do so "in the next year

32

or so."  Each shopper was shown either a tap handle identical in all respects to that which had been distributed with the kegs of C-O-B's product, or one identical in all respects except the insertion of the word "Boy" for "Budd."[22]

Each participant was then asked whether he or she had an "opinion about who puts out the product whose tap handle you just saw."  If the answer was "yes," the interviewee was then asked (1) who he or she believed put out the product, and why, (2) whether he or she believed that the company that puts out the product was affiliated or connected with any other brand or company, and if so, which one and why, and (3) whether he or she believed that the company that puts out the product has permission to do so from any other brand or company, and if so, which one and why.

Twenty-seven percent of those exposed to the "Billy Budd" handle claimed to have an opinion about the source of the

---

[22]C-O-B points out that the photograph of "Tap Handle Example" attached to McCullough's study shows the "i" in "Billy Budd" dotted in red, rather than in blue as it was on the tap handles distributed with kegs of Billy Budd Classic American Ale. With A-B's reply materials, however, McCullough submitted a supplemental declaration stating that the "i" on the tap handles used in his survey was, in fact, dotted in blue.  There is no issue of fact, then, going to whether the tap handle used in the survey was identical to those distributed with C-O-B's kegs.

product.  Of that group, eleven percent believed A-B put out the beer, thirteen percent believed that A-B was affiliated or connected with whomever put out the beer, and five percent believed that whoever put out the beer had permission from A-B to do so.  Thus, a total of twenty-five percent of those exposed to the Billy Budd tap handle associated the product with A-B. McCullough used this figure as the basis of his opinion that "the survey demonstrates a substantial likelihood of confusion between the Billy Budd product and those of [A-B] . . . ."

C-O-B attempts to challenge McCullough's conclusion with the testimony of its own expert, Andrew Smith, Ph.D., the director of the University of New Hampshire Survey Center.  While Smith concedes that McCullough's questionnaire was "unbiased" and his data "accurate," Smith claims to disagree with McCullough's conclusion on a number of grounds.  The fact that C-O-B has procured an expert affidavit which purports to contradict that of A-B's expert, however, does not necessarily render summary judgment inappropriate.  See Magarian v. Hawkins, 321 F.3d 235, 240 (1st Cir. 2003).

Smith asserts, based on the fact that seventy-four percent of the interviewees who saw the "Billy Budd" handle either had no opinion on, or otherwise did not know, who put out the product,

34

that "few if any of the experimental subjects . . . had any idea whatsoever who put out the product . . . ."  He does not articulate, however, what effect his characterization of the size of this class as "few" has upon McCullough's conclusion.  Smith does not explain, for example, how many more of the subjects would have needed to have an opinion about the source of the product in order for McCullough's conclusion to be supportable.  His statement does not create a triable issue as to the actual confusion caused by C-O-B's use of the Billy Budd mark.[23]

Smith also concludes that "those subjects who said they had an opinion about who puts out the product were simply guessing."  A-B correctly notes, however, that a consumer survey properly designed to measure confusion necessarily asks participants to guess as to the source of the product upon seeing the junior mark.  Such a survey does not attempt to gauge what respondents objectively know about the source of the goods advertised by the mark at issue, but rather "the subjective mental associations and

_____

[23]Indeed, Smith's opinion has been rejected as a matter of law by one court.  See Frank Brunckhorst Co. v. G. Heileman Brewing Co., 875 F. Supp. 966, 981 & n.23 (E.D.N.Y. 1994) (rejecting defendant's argument that survey in which fewer than 3% of all participants identified mark with plaintiff failed to show confusion, because 34% of the participants who had a belief as to the source of the mark identified it with plaintiff).

35

reactions of prospective purchasers" with respect to the mark. 5 McCarthy § 32:158. Accordingly, Smith's opinion that the consumers who expressed a belief that A-B put out Billy Budd based on the tap handle "were displaying pseudo-opinions, keying on the syllable 'bud' in both the Billy Budd and Budweiser names," does not create a factual dispute. To the contrary, it confirms McCullough's conclusion that the Billy Budd Classic American Ale mark confuses consumers into believing that A-B either is or is affiliated with the source of that brew.[24]

Smith also calls McCullough's survey "problematic" because the interviews occurred in the "artificial environment" of a shopping mall, rather than in a bar, restaurant, or store. Smith opines that in such a "realistic purchase environment, the chances that a beer purchaser would be confused between Billy Budd and Budweiser are quite remote." As an initial matter, this testimony is insufficient to defeat summary judgment because it lacks any foundation, i.e., Smith does not present the

---

[24]Put differently, Smith's testimony that the respondents who expressed an opinion as to the source of Billy Budd were guessing, instead of demonstrating their actual knowledge, is irrelevant to the actual confusion inquiry. Also irrelevant, then, is his opinion that McCullough's survey is faulty because it does not include demographic information on the participants from which their susceptibility to guessing could be deduced.

conflicting results of a consumer study which was actually conducted in a bar, restaurant, or other beer retail outlet or provide any other basis for his opinion. Furthermore, Smith's testimony runs afoul of settled law that mall-intercept surveys of the kind conducted by McCullough are acceptable proof of actual confusion. See 5 McCarthy § 32:165. To the extent his opinion simply challenges McCullough's methods, then, it is contrary to law and therefore fails to create an issue of material fact. See Rebel Oil Co. v. Atl. Richfield Co., 146 F.3d 1088, 1094 (9th Cir. 1998); 11 James Wm. Moore et al., Moore's Federal Practice § 56.14[1][e] (3d ed. 2003).

Finally, even if all of Smith's objections to McCullough's report were proper, they would not constitute evidence rebutting the report as proof of actual confusion, but would merely affect its weight in that regard.[25] This is inadequate for purposes of opposing a summary judgment motion. See Collier v. City of Chicopee, 158 F.3d 601, 604 (1st Cir. 1998). Smith's affidavit

---

[25]Smith's final criticism of McCullough's report is that it swept too broadly in including participants based solely on their having ordered a microbrewed beer in the past year or saying that they might order one in the next year. Smith expresses no opinion, however, on how--or even whether--reducing the participant class to "the consumers to whom Billy Budd Classic American Ale is targeted" would change the survey result. Accordingly, this testimony creates no issue of material fact.

fails to create a triable issue as to the actual confusion factor of the likelihood of confusion test. Therefore, the court finds that the actual confusion inquiry weighs in A-B's favor. A-B's favor.

E. C-O-B's Intent in Adopting Its Mark

The assessment of a defendant's intent as a component of the likelihood of confusion analysis focuses on whether the defendant has tried to take advantage of the senior user's "good will, reputation and market recognition or whether it was simply using its own name without any such intent." See Best Flavors, 886 F. Supp. at 917. A lack of bad faith on the defendant's part, however, does not rule out the existence of a likelihood of confusion in the final analysis. See Century 21 Real Estate Corp. v. Century 21 Real Estate, Inc., 929 F.2d 827, 829 (1st Cir. 1991); see also Best Flavors, 886 F. Supp. at 917-18. Indeed, "[l]ittle weight" is given to the conclusion that a defendant did not intentionally copy a plaintiff's mark. See I.P. Lund, 163 F.3d at 44.

A-B argues that the summary judgment record shows that C-O-B "clearly intended to take advantage of the fame and reputation of the famous BUD brand." As evidence of this

38

proposition, A-B points to (1) Keeney's admission that she knew of A-B's use of the Bud mark for beer at the time C-O-B decided to use the Billy Budd mark for beer, (2) Bowse's comment to C-O-B's officers that he imagined their choice of the name would "raise a few eyebrows,"[26] Bowse Dep. at 112, and (3) the inclusion of a telephone number containing the word "BUDD" on both the keg labels and the T-shirts.

C-O-B responds with Sapuppo-Bertrand's testimony that both the name and artwork for the Billy Budd Classic American Ale trademark registration were inspired by Melville's literary work, together with unauthenticated documents represented in the memorandum to be the original sketches for the artwork and a contract with a local artist "to finalize the oil paintings of the Billy Budd and Boston Bluebeard designs." Sapuppo-Bertrand explains the toll-free phone number as the product of a choice of a number with digits "similar" to those of her home number from among several offered to her. These digits also happened to spell out "BUDD" on a telephone keypad, so Sapuppo-Bertrand "took advantage of the opportunity to have a toll free number which

---

[26]A-B also submits C-O-B's November 10, 1999, letter to Bowse which referenced A-B's potential opposition to C-O-B's trademark application. A-B does not explain how this document shows C-O-B's bad faith in using the Billy Budd mark.

would reflect [C-O-B's] product."  Sapuppo-Bertrand Aff. ¶ 5.

A-B protests that Sapuppo-Bertrand's explanation of her actions "defies credibility."[27]  In deciding a motion for summary judgment, however, a court may not inquire into an affiant's credibility.  See Anderson, 477 U.S. at 255.  C-O-B has come forward with enough evidence to create a factual dispute as to its intent in adopting the Billy Budd Classic American Ale mark.  Drawing all reasonable inferences from this evidence in C-O-B's favor, the defendant's intent inquiry weighs in favor of C-O-B.

F.    The Strength of the Bud Mark

"[S]trong marks enjoy the greatest protection against infringement."  Int'l Ass'n of Machinists, 103 F.3d at 206 (citing Aktiebolaget, 999 F.2d at 5).  To determine the strength

---

[27]A-B also makes much of Keeney's testimony that C-O-B chose to market a beer under the name Billy Budd because "it suited perhaps a beer more than any other product."  Keeney Dep. at 52. A-B's reference to this testimony takes this statement out of context, where Keeney explained that Billy Budd "suited perhaps a beer" because it was a "manly name or it could be a manly figure."  Id.  Indeed, A-B's memorandum even goes so far as to replace Keeney's use of the word "perhaps" with an ellipse in quoting her testimony.  The court looks with disfavor on such distortions of the record.  The cited testimony provides no basis for inferring that C-O-B thought the name "Billy Budd" suited a beer because of the existence of A-B's Bud products.  In any event, such an inference in A-B's favor would not be proper in deciding its motion for summary judgment.

40

of a mark, courts examine "the length of time a mark has been used and the plaintiff's relative renown in its field; the strength of the mark in plaintiff's field of business, especially by looking at the number of similar registered marks; and the plaintiff's actions in promoting its mark." Boston Athletic Ass'n, 867 F.2d at 32 (internal citations omitted).

In its memorandum, C-O-B states that it "does not object to the fact that A-B's BUD and BUDWEISER marks are strong marks." Indeed, based on the record evidence, that proposition is beyond dispute. C-O-B argues, however, that the Bud mark is not entitled to "absolute protection" because "[m]any other marks with the use of the 'bud' name are currently in use." This argument largely misses the point. Far from seeking "absolute protection" for the Bud mark, A-B is seeking to restrain C-O-B's use of a similar mark on a similar product sold and advertised in similar channels.[28] C-O-B has not come forward with any proof

_____

[28]C-O-B's reliance on this court's decision in Cal. Prods. Co. v. PPG Indus., Inc., 18 U.S.P.Q.2d 1232 (D.N.H. 1990), is misplaced. While it is true that the court there relied on the existence of four other trademarks using the word "Storm" in refusing to enjoin the defendant's marketing of "Stormguard" stain, the court also found for the defendant on all but one of the other likelihood of confusion factors, including a finding that the marks were not similar. Id. at 1234-36. Moreover, it is unclear from the decision whether "Storm" had been used in connection with products related or unrelated to those of the

41

that anyone other than A-B has ever been permitted to use the word "Bud" in the name of a beer. Cf. Power City, 28 F. Supp. at 743 (enjoining use of name "Niagra Bud" for beer).

Instead, C-O-B has submitted an unauthenticated document entitled "Trademark Office Research" which purports to show "22 active marks that contain the word 'bud' from a search of the Patent and Trademark Office database." Even if this document were competent evidence under Rule 56(e), it does not show the use of the word "bud" to describe any products similar to those sold under A-B's Bud mark. Cf. Anheuser-Busch, Inc. v. Florists Ass'n of Greater Cleveland, Inc., 603 F. Supp. 35, 37 (N.D. Ohio 1984) (allowing defendant florist's use of slogan "This Bud's for you" because it had no "strength with respect to fresh-cut flowers").[29] It merely demonstrates the registration of marks which include the word "bud" for a number of wholly unrelated products, including auto parts, frozen pies, and a catfish restaurant, as well as lawn care and janitorial services and a public literacy program. Many of these marks also use the word

---

plaintiff. See id.

[29]The unauthenticated photograph submitted by C-O-B appears to demonstrate the use of "This Bud's for you" authorized by this litigation.

"bud" with descriptive phrases which would seemingly eliminate consumer confusion, e.g., "Budd Van Lines" and "Bud Brothers Hemporium Smoke Supplies Hemp Products." The list of third-party registrations of "bud" therefore fails to create an issue of fact as to the strength of A-B's mark. Cf. Boston Athletic Ass'n, 867 F.2d at 32. The strength of the mark inquiry weighs in A-B's favor.

In sum, C-O-B has failed to raise a genuine issue of material fact with respect to seven of the eight factors which inform the likelihood of confusion analysis, namely (1) the similarity of the marks, (2) the similarity of the goods, (3) the relationship between the parties' channels of trade, (4) the relationship between the parties' advertising, (5) the classes of prospective purchasers, (6) evidence of actual confusion, and (7) the strength of the Bud mark.

There is a factual dispute as to C-O-B's intent in using the Billy Budd mark. Nevertheless, the absence of evidence as to a defendant's intent does not in of itself preclude summary judgment for the plaintiff in an infringement case. See Copy Cop, 908 F. Supp. at 45. There is therefore no genuine issue of fact sufficient to require a trial on the likelihood of confusion

engendered by C-O-B's use of the Billy Budd mark.  Accordingly,
A-B's motion for summary judgment on its Lanham Act claims,
comprising counts I and II of its complaint, is granted.


II.  Trademark Dilution under New Hampshire Law

A-B also seeks summary judgment on count four of its
complaint, brought under the New Hampshire anti-dilution statute,
RSA 350-A:12.[30]  Because A-B would not be entitled to any
remedies under RSA 350-A:12 beyond those provided by the Lanham
Act, the court declines to address the state-law claim in the
context of A-B's summary judgment motion.[31]  See Quabaug Rubber

---

[30]  This statute provides that:

Likelihood of injury to business reputation or of
dilution of the distinctive quality of a mark
registered under this chapter, or a mark valid at
common law, or a trade name valid at common law, shall
be a ground for injunctive relief notwithstanding the
absence of competition between the parties or the
absence of confusion as to the source of goods and
services.

RSA 350-A:12 (2002).

[31]Although it is unnecessary to resolve A-B's state anti-
dilution claim, the court notes that "in several cases, where
traditional likelihood of confusion of sponsorship is found, the
court will also find, almost as an after thought, that there has
been dilution.  This seems to be a harmless redundancy."  E. & J.
Gallo, 782 F. Supp. at 469 (internal quotation marks and citation
omitted).

44

Co. v. Fabiano Shoe Co., 567 F.2d 154, 161 n.14 (1st Cir. 1977).

It also appears that A-B would not be entitled to any additional relief if it were to succeed on its claims for federal trademark dilution (count three), or its claims for common law trademark infringement and unfair competition (count five), which were not presented in its motion for summary judgment. Accordingly, counts three, four, and five will be dismissed without prejudice as moot unless A-B objects by October 17, 2003.

III. Appropriate Remedy

A-B has requested the following relief: (1) a judgment that C-O-B has violated A-B's rights in the Bud mark; (2) a permanent injunction preventing C-O-B and its owners, officers, directors, agents and those otherwise related to C-O-B from using the Billy Budd Classic American Ale mark or any other confusingly similar mark in the promotion of beer and other related products; (3) an order requiring the destruction of any material depicting the infringing marks; (4) a report from C-O-B detailing its compliance with the court's order in this regard; and (5) attorneys' fees under 15 U.S.C. § 117(a), with costs and prejudgment interest.

"A victim of infringement is entitled to as much protection

45

as is required to stop the infringement." Aktiebolaget, 999 F.2d at 5. Nevertheless, "[i]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to [the] plaintiffs, . . . and courts must closely tailor injunctions to the harm that they address." Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 40 (1st Cir. 2002) (internal quotation and citation omitted). The "safe distance rule," however, "counsels that 'an infringer, once caught, must expect some fencing in. . . .'" Id. (quoting 5 McCarthy § 30:4). Furthermore, "[s]trong marks . . . require stronger measures to remedy infringement." Aktiebolaget, 999 F.2d at 5. With these principles in mind, the court rules that the plaintiff is entitled to the relief it seeks, with one exception. See 15 U.S.C. § 1116(a).

The Lanham Act provides that a court "in exceptional cases may award reasonable attorneys' fees to the prevailing party." 15 U.S.C. § 1117(a). If the party seeking attorneys' fees proves by clear and convincing evidence that such exceptional circumstances exist, the court may award attorneys' fees at its discretion. See Gillette Co. v. Norelco Consumer Prods. Co., 69 F. Supp. 2d 246, 267 (D. Mass. 1999). A non-exclusive list of

conduct justifying an award of attorneys' fees includes "malicious, fraudulent, deliberate, or willful" infringement. Tamko Roofing Prods., 282 F.3d at 31 (internal quotation marks omitted); see also Kappa Sigma, 654 F. Supp. at 1103 (awarding fees based on defendant's willful and deliberate exploitation of plaintiff's mark).

Although C-O-B may have been careless in its selection of a name for its brew and arguably should have been aware of the likelihood that the Billy Budd mark would result in confusion with A-B's Bud products, C-O-B's conduct was not so egregious as to require it to pay A-B's attorneys' fees. As discussed, the summary judgment record is less than convincing as to A-B's charge that C-O-B adopted its mark with the intent of unfairly capitalizing on A-B's substantial investment in the Bud mark. A-B did not come forward with evidence that any real-world beer drinker was ever actually confused into buying C-O-B's product instead of one of A-B's brews because he or she thought Billy Budd Classic American Ale emanated from or was affiliated with A-B, although McCullough's study constitutes undisputed circumstantial proof of actual confusion. Finally, it is undisputed that C-O-B grossed only $385 from NHCB's kegs of Billy

47

Budd Classic American Ale, suggesting that C-O-B made only the slimmest of profits by infringing upon the Bud mark, and even this infringement was very limited both geographically and temporally. An award of attorneys' fees is therefore not appropriate in this case. See Volkswagenwerk, 814 F.2d at 821.


## Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment (document no. 44) is granted as to counts one and two. A-B shall propose an order setting forth the relief allowed by the court, and in accordance with the legal principles outlined by the court, including specific parameters for C-O-B's destruction of infringing materials as authorized by 15 U.S.C. § 1118. The proposed order shall be filed and served upon opposing counsel by October 17, 2003. C-O-B is to file any objections to the proposed order by October 24, 2003.

If A-B seeks additional relief on counts three, four, and five, it shall notify the court by October 17, 2003. If no such

notice is filed, the court will dismiss counts three through five, without prejudice, as moot.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

October 9, 2003

cc:   Arpiar G. Saunders Jr., Esquire
      Michael W. Rafter, Esquire
      George L. Little Jr., Esquire
      Brian S. Withers, Esquire
      Robert A. Shaines, Esquire
      Peter Bennett, Esquire