Rockingham
No. 2006-438

WILLIAM F. BECKSTED, SR. & a.

v.

J.P. NADEAU & a.

Argued: May 9, 2007
Opinion Issued: June 26, 2007

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Philip L. Pettis* on the brief and orally), for the plaintiffs.

*Gottesman and Hollis*, of Nashua (*Anna Barbara Hantz* on the brief and orally), for the defendants.

GALWAY, J. The plaintiffs, William F. Becksted, Sr., William F. Becksted, Jr. and Becksted Associates, appeal a ruling of the Superior Court (*Morrill*, J.) granting a motion by the defendants, J.P. Nadeau, Justin P. Nadeau, the Nadeau Law Offices, P.L.L.C. and Gail C. Nadeau,

for a directed verdict on the plaintiffs' claim under RSA chapter 358-A (1995 & Supp. 2006), the New Hampshire Consumer Protection Act (CPA). We reverse and remand.

The evidence presented to the trial court included the following. The plaintiffs are carpenters whom the defendants hired to build a second-story apartment for Justin Nadeau above the Nadeau Law Offices. Justin Nadeau is an attorney with the Nadeau Law Offices. The plaintiffs began work on the project in May or June 2004. In July, J.P. Nadeau began representing the plaintiffs in an unrelated legal matter. J.P. Nadeau is Justin Nadeau's father and is also an attorney in the Nadeau Law Offices.

The plaintiffs continued performing construction work for the defendants and submitted invoices every two to four weeks, which the defendants paid until the final invoice, which totaled $39,000 and was submitted in December. The defendants disputed the amount of this final invoice.

On December 29, the Nadeau Law Offices issued its first bill for legal services to the plaintiffs. This itemized bill accounted for all work performed from July to December, listing the dates of the work, the hours worked, and a description of the work performed. The final page of the bill listed 57.15 as the total hours worked, $210.00 as the hourly rate, and $12,001.50 as the total amount due. Prior to receiving this bill, none of the defendants had informed any of the plaintiffs about the number of hours that J.P. Nadeau was working or the amount that he would charge.

By January 11, 2005, the defendants had not paid the $39,000 charged by the plaintiffs and the plaintiffs had not paid the $12,001.50 charged by the Nadeau Law Offices. The plaintiffs had completed work on the defendants' law office, and J.P. Nadeau continued to represent the plaintiffs. On January 11, J.P. Nadeau sent the plaintiffs a letter on Nadeau Law Offices stationery, which listed both J.P. Nadeau and Justin Nadeau as members of the firm. It stated that both J.P. Nadeau and Justin Nadeau felt that they should not have to pay any of the $39,000 charged by the plaintiffs because the charges exceeded an agreed-upon price for the work and charged too much for various individual tasks. The letter called some of the plaintiffs' charges "absurd," "outrageous," and "abuses of the trust that Justin placed in you." The letter noted that the plaintiffs' outstanding bill with the Nadeau Law Offices was $12,474 and that representation of the plaintiffs through a mediation scheduled for February 16 would increase the total bill to over $15,000. The letter offered to waive these legal fees and represent the plaintiffs through mediation in exchange for the plaintiffs' waiver of their $39,000 invoice.

The Nadeau Law Offices sent another bill to the plaintiffs on February 24. It itemized the fees incurred from January 3 to February 16 and added those fees to an outstanding balance of $12,474 for a total of $15,708.

On March 4, Justin Nadeau sent a letter to the plaintiffs on Nadeau Law Offices stationery. The letter stated, in part: "You misrepresented your performing the work I wanted done . . ."; "[y]ou overcharged me for some of the work you did . . ."; "[y]ou failed to perform your duties as a General Contractor . . ."; and "[y]ou secretly marked up the costs of flooring, cabinets and other materials." The letter further stated: "I have absolutely no intention of paying you one cent more. You took advantage of my trust and abused it . . . . You have caused me substantial damages and losses and I have all I can do to restrain myself from suing you."

Upon receiving Justin Nadeau's letter, William Becksted, Sr. became concerned that either the Nadeau Law Offices, Justin Nadeau, or J.P. Nadeau would sue the plaintiffs. Becksted, Sr. inspected the two bills sent by the Nadeau Law Offices and found that the December 29 bill had charged the plaintiffs for over twenty hours that were not itemized or otherwise accounted for. He added the hours worked, multiplied that number by the rate of $210 per hour, and arrived at a final charge of approximately $5,000, rather than the $12,001.50 originally charged. The plaintiffs subsequently filed a complaint regarding the erroneous bill with the Attorney Dispute Resolution Committee (ADRC). Soon after the ADRC notified the defendants of the plaintiffs' fee dispute, the Nadeau Law Offices sent two corrected bills to the plaintiffs, reducing the amount owed from $15,708 to $8,589.

The legal proceedings in superior court began on March 30, when the plaintiffs obtained a mechanic's lien to attach $39,047.15 of real estate and fixtures at the defendants' law office, and filed a writ alleging breach of contract, quantum meruit, and violations of the CPA. The CPA claim alleged that the defendants "presented the Plaintiffs with their first bill for services, which was excessive, misleading and false, in the amount of $12,001.50 . . ." and that

> the Defendants have attempted to use those excessive, misleading and false legal bills to coerce the Plaintiffs to waive their bill for construction services and materials for $39,047.15; that the Defendants are in the business of selling and distributing legal services and products and are subject to the provisions of RSA 358-A . . . and the Plaintiffs are consumers within the definition of the Act . . . .

The trial court severed the CPA claim from the other claims.

A jury trial on the CPA claim commenced on April 5, 2006. After the plaintiffs rested, the defendants moved for a directed verdict, arguing that there was no evidence of a violation of the CPA. They contended that the evidence demonstrated, at most, billing errors, and did not prove unfair or deceptive practices.

The trial court granted the defendants' motion for three reasons. First, the plaintiffs failed to introduce evidence that would support findings that the defendants engaged in deceptive acts. The plaintiffs were not deceived by the defendants, the trial court reasoned, because the bill was itemized and plainly showed the error. Second, the plaintiffs failed to introduce sufficient evidence that they suffered an injury. There was no injury, the trial court reasoned, because the plaintiffs never paid the erroneous bill. Third, the court found that the defendants were "surprised" by evidence of changes made to the hours of the bills by J. P. Nadeau.

The plaintiffs challenge all three reasons given by the trial court. We note, however, that the parties do not dispute on appeal that the plaintiffs are consumers and that the defendants engaged in trade or commerce under the CPA. *See* RSA 358-A:2 (1995).

## I. Deceit

The plaintiffs first argue that the trial court erred by ruling that they failed to introduce sufficient evidence that the defendants deceived them. The defendants argue that there was no deceit because the first bill contained obvious computational errors and the letter sent from J.P. Nadeau was only negotiation.

■ A trial court may grant a motion for a directed verdict only if it determines, after considering the evidence and construing all inferences therefrom most favorably to the non-moving party, that no rational juror could conclude that the non-moving party is entitled to any relief. *Dillman v. N.H. College*, 150 N.H. 431, 434 (2003). If the evidence adduced at trial is conflicting or permits several reasonable inferences, a motion for a directed verdict should be denied. *Id.* We will uphold a trial court's ruling on a motion for a directed verdict when the record supports the conclusion that the trial court did not commit an unsustainable exercise of discretion. *Id.*

The CPA provides, in relevant part: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. After this general proscription of unfair or deceptive trade practices, the CPA lists specific types of conduct that qualify as unfair or

deceptive trade practices. *See id.* The plaintiffs rely upon the general proscription.

■ "We have recognized that the general provision of the CPA is broadly worded, and not all conduct in the course of trade or commerce falls within its scope." *State v. Moran,* 151 N.H. 450, 452 (2004). Because of the difficulty often associated with determining whether commercial actions not specifically listed in RSA 358-A:2 are prohibited, we employ the rascality test. *Id.* Under the rascality test, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* (quotation and brackets omitted). This test applies equally to the analysis of civil and criminal cases. *Id.* In determining whether the defendants' actions violate the general provision of the CPA, we also look for guidance to the federal courts' interpretation of the Federal Trade Commission Act. *Id.* at 452-53. The Federal Trade Commission determines if actions are unfair or deceptive by inquiring:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
>
> (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Id.* at 453. Accordingly, the issue before us is whether the trial court erred in ruling, after considering the evidence and construing all inferences therefrom most favorably to the plaintiffs, that no rational juror could conclude that the plaintiffs are entitled to any relief based upon the above standards.

The evidence was that the defendants disputed the $39,000 charged by the plaintiffs for finishing their work on Justin Nadeau's apartment. Shortly after receiving this disputed bill, the Nadeau Law Offices submitted its first bill to the plaintiffs, after performing legal work on their behalf for approximately six months. It is undisputed that this bill erroneously inflated the cost of the defendants' services by more than double. J.P. Nadeau, who was representing the plaintiffs, sent a letter on Nadeau Law Offices stationery asserting that the defendants should not have to pay any of the plaintiffs' $39,000 bill because the plaintiffs had

already significantly overcharged them, but offered to forego charging the plaintiffs approximately $15,000 in legal services if the plaintiffs would forego charging the disputed construction fees. Justin Nadeau, also a lawyer in the law firm representing the plaintiffs, sent a letter accusing the plaintiffs of poorly and deceitfully performing their work, asserting that he would not pay the plaintiffs' bill, stating that the plaintiffs caused him damages and indicating that he was restraining himself from suing them. One plaintiff testified that as a result of these letters, he became concerned that the Nadeau Law Offices, Justin Nadeau or J.P. Nadeau would sue him.

We conclude that a rational juror could find that the defendants attempted to deceive the plaintiffs by inflating the legal bill sent on December 29 and using that inflated amount to bargain with the plaintiffs. A rational juror could conclude that it was to the defendants' advantage to intentionally overstate their legal fees, because the closer the legal fees came to the plaintiffs' charges, the more likely the plaintiffs would be to waive their bill.

■ The defendants argue that J.P. Nadeau testified that he did not know that the December 29 bill was erroneously calculated and that the error was clear on the face of the bill; however, "[i]f the evidence adduced at trial is conflicting or permits several reasonable inferences, a motion for a directed verdict should be denied." *Dillman*, 150 N.H. at 434. Although a rational juror could find that the defendants' actions were not deceitful, a rational juror might also reasonably infer the contrary. Accordingly, we conclude that the trial court committed an unsustainable exercise of discretion by granting the defendants' motion for directed verdict based upon a finding that the plaintiffs failed to introduce sufficient evidence of deceit.

## II. Injury

The plaintiffs next argue that the trial court erred by granting the motion for directed verdict based, in part, upon the finding that the plaintiffs failed to show an injury. The plaintiffs argue that actual damages are not required to obtain relief under the CPA.

In ruling that the plaintiffs failed to show that they suffered an injury, the trial court stated: "But here, there's been no injury. They didn't lose anything as a result of the deceptive acts they claimed. They didn't settle their lawsuit based on deceptive acts." The trial court relied upon RSA 358-A:10 (1995) in ruling that the CPA requires proof of an injury.

We review the trial court's statutory interpretation *de novo*. *In the Matter of Giacomini & Giacomini*, 151 N.H. 775, 776 (2005).

> We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute.

*Id.* at 776-77 (citations omitted).

RSA 358-A:10, I, states, in pertinent part:

> Any person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper. If the court finds for the plaintiff, recovery shall be in the amount of actual damages or $1,000, whichever is greater. If the court finds that the ... act or practice was a willful or knowing violation of this chapter, it shall award as much as 3 times, but not less than 2 times, such amount. In addition, a prevailing plaintiff shall be awarded the costs of the suit and reasonable attorney's fees, as determined by the court.

Contrary to the trial court's ruling, we have previously held that RSA 358-A:10 does not require a showing of actual damages for the claimant to be awarded the statutory minimum and attorney's fees. *Preferred Nat'l Ins. Co. v. Docusearch*, 149 N.H. 759, 767 (2003). "[T]he statute mandates that the trial court award the prevailing plaintiff the minimum of $1,000 in damages plus costs and reasonable attorney's fees." *Carter v. Lachance*, 146 N.H. 11, 14 (2001). This case presents no reason for us to diverge from our prior holdings. Accordingly, we conclude that the trial court erred in granting the defendants' motion for directed verdict based upon the plaintiffs' failure to show actual damages.

In light of our rulings above, we conclude that we need not address the trial court's ruling on surprise.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.