NLMA v. NSPC, JH Jackson                    CV-09-290-JM  05/06/10  P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Northeastern Lumber
Manufacturers Assoc.

     v.                                     Civil No. 09-cv-290-JM
                                       Opinion No. 2010 DNH 080P
Northern States Pallet
Company, Inc. and
James H. Jackson


**O R D E R**


Plaintiff Northeastern Lumber Manufacturers Association
("NeLMA") is a trade association that certifies the grade and
quality of lumber and whether lumber used in wood packaging
materials has been treated according to industry standards
governing the control of wood-borne insects and plant-based
diseases.  Defendants Northern States Pallet Company, Inc.
("Northern States") and its president, James H. Jackson
("Jackson"), were engaged in the sale, service and removal of
wood pallets used in shipping both domestically and overseas.  In
this action, NeLMA alleges defendants misappropriated a
certification stamp and used it to mark untreated lumber as
actually comporting with industry safety standards.  Before the

court is NeLMA's motion for partial summary judgment on counts one, two and three, which assert claims of trademark infringement and unfair competition in violation of The Lanham Act, 15 U.S.C. § 1501, et seq. ("the Lanham Act"), and the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. Ch. 358-A ("CPA"). Document no. 38. Defendants object, contending NeLMA does not have viable trademark claims or unfair competition claims because its registered marks cover lumber, not wood packaging materials ("WPM") like the pallets defendants used, and NeLMA has not controlled the use of the marks in its certification programs. For the reasons set forth below, plaintiff's motion is denied in part and granted in part.

Discussion

**1. Uncontested Facts**

NeLMA is accredited by the American Lumber Standards Committee ("ALSC") to provide inspection services to facilities that manufacture timber, lumber and wood packaging materials, and has been engaged in this type of work since at least 2002. See Pl.'s Mot. for Summ. J., 9/4/09 Easterling Aff. (document no. 12.4) ("Easterling Aff."), ¶ 8. NeLMA owns trademarks which it promotes as certifying to both the industry and the public that

2

lumber used in WPM complies with national and international standards.  See Pl.'s Statement of Material Facts (document no. 38.3) ("Pl.'s Facts"), ¶¶ 3-4.  NeLMA owns two marks:  No. 2731831 (the "831 mark"), registered on July 1, 2003; and No. 3061638 (the "638 mark"), registered on February 28, 2006.  See Pl.'s Facts, ¶ 1.[1]  The registration forms for both marks state: "The certification mark, as used by authorized persons, certifies the quality level of the grade of lumber on which it is placed." See Defs.' Resp. to Pl.'s Facts (document no. 40.2) ("Defs.' Resp.") at 6 (quoting Defs.' Mot. to Supp. Obj. to Pl.'s Mot. for Expedited Relief, Ex. 2 (9/30/09 Aff. of Jeffrey L. Snow) (document no. 23-2)) ("9/30/09 Snow Aff."), ¶¶ 1 & 2 (attaching copies of the marks' registrations with the U.S. Patent and Trademark Office ("PTO")).  The registrations also state that the marks are for "Lumber, in Class A," with the 831 mark stating its "First Use In Commerce [was] 2-1-1971," and the 638 mark's "First Use In Commerce [was] 5-1-2004."  See id.

NeLMA enforces two distinct certification programs:  one for softwood lumber products and one for wood packaging materials.

_____

[1]The 831 mark is NeLMA's logo, which depicts three trees growing out of the word NeLMA, inside a circle.  The 638 mark is simply the word "NeLMA" in bold, block letters.  See Easterling Aff., Ex. A.

3

With respect to the softwood lumber products, NeLMA is authorized by ALSC to issue to lumber and timber manufacturers stamps that are used to reflect the grade of the wood based on preset industry standards for quality and size.[2]  NeLMA provides instruction, supervision and technical information about grading to lumber and timber manufacturers throughout the Northeastern and Great Lakes regions of the United States, who agree to regular inspections by NeLMA to ensure the grading standards are being followed.  See 9/30/09 Snow Aff., ¶ 3 (attaching article on lumber grading from NeLMA's website).

With respect to wood packaging materials, NeLMA inspects the facilities that produce WPM to ensure they are following certain international safety standards that are designed to reduce the phytosanitary[3] problems caused by the spread of wood-borne insects and diseases through WPM used in global trade.  NeLMA's

_____

[2]The standards are known as Voluntary Product Standards that are set by the National Institute for Standards and Technology ("NIST"), an agency of the U.S. Department of Commerce.  See 9/30/09 Snow Aff., ¶ 3 (attaching an article posted on NeMLA's website).  Lumber must comply with PS 20-05.  See id.

[3]Phytosanitary is derived from two Greek words, phyto meaning plant and sanitary, meaning clean.  Phytosanitary certification is required by many countries for the import and export of nonprocessed, plant and agricultural products.  See http://ask.reference.com/related/Phytosanitary+Certificate?

4

inspection program follows the "International Standard for Phytosanitary Measures ("ISPM") - Guidelines for Regulating Wood Packaging Material in International Trade."[4] See id., ¶ 4 (attaching article on WPM inspection from NeLMA's website); see also Pl.'s Facts, ¶¶ 7-8. ISPM 15 requires all lumber used in WPM to be treated either by a heat process or a chemical fumigation process. Id. ¶¶ 9-10. NeLMA certification indicates that lumber was heat treated, not chemically treated. Id. ¶ 11; see also 9/30/09 Snow Aff. ¶ 4 (attaching web pages). ALSC-accredited inspection agencies like NeLMA examine the facilities using WPM and certify that the facilities are following IPSM 15. Once certified, each facility gets its own IPPC stamp that includes the IPPC logo, the facility's unique number, and the logo of the certifying agency, such as NeLMA. See id.

Heat treatment of lumber is a two-step process. See id. At the first step, each piece of heat-treated lumber is marked with an "HT" stamp and an ALSC-accredited inspection certification stamp, like NeLMA's logo. Then the certified facility uses the heat-treated lumber to manufacture finished WPM, such as pallets,

---

[4]These standards were developed at the International Plant Protection Convention ("IPPC") in March 2002 and have been adopted by more than 150 participating countries.

skids, crates or boxes. See id.; see also Pl.'s Facts ¶ 12-16. The cut pieces of the heat-treated lumber do not each need to be stamped, but the finished WPM item must display its certification stamps on at least two opposite sides, clearly visible to customs officials and signifying to them that the item complies with ISPM 15. Id. ¶ 17; see also 9/30/09 Snow Aff. ¶ 4 (attaching NeLMA's web pages).

The NeLMA logo is a valuable asset to the certified facility using it, because it is widely accepted as a sign of quality assurance. See Pl.'s Facts, ¶¶ 18-19. Defendants were neither certified by NeLMA nor authorized to use NeLMA's marks, yet Jackson admitted to having used a NeLMA stamp in his business from 2006 until NeLMA discovered that unauthorized use in the summer of 2009. Id. ¶¶ 20, 25-27, 29 & 31-32. Northern States sold new and recycled pallets and skids, with the type of heat-treated pallets at issue here representing about 5% of its annual business. See Pl.'s Mot. for Leave to File Response, Att. 3, 8/31/09 Aff. of James H. Jackson (document no. 7.3) ("Jackson Aff."), ¶¶ 4 & 5. In 2006, another company, Index Packaging, Inc. ("Index Packaging"), which was a facility certified by NeLMA to heat-treat WPM, delivered some pallets to Northern States.

6

Jackson found Index Packaging's NeLMA-issued stamp on a trailer and took it, in order to stamp Northern States' wooden pallets, despite knowing that Northern States was not certified and was not following ISPM 15. See id. ¶¶ 20-25, 27, 29, 31-32. Jackson understood that using a NeLMA stamp created the misimpression that Northern States' WPM had been heat treated, and he also understood the environmental risks that his noncompliance with ISPM 15 created. See id. ¶¶ 28-33.

NeLMA's certification program involves regular inspection of certified facilities, including their equipment and inventory, yet NeLMA did not realize that Index Packaging's stamp was missing for nearly three years before it was returned on August 19, 2009. See Jackson Aff. ¶ 8; see also Defs.' Resp., Ex. 1 (document no. 40.3). After returning the Index Packaging stamp, Northern States had no other certification stamp or any other stamp resembling plaintiff's marks at issue here. Northern States also has depleted its inventory of all the wooden pallets that bore the Index Packaging stamp with NeLMA's mark. See id. ¶¶ 8-9.

## 2. Standard of Review

Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986), and a material fact is one "that might affect the outcome of the suit." Id. at 248. The evidence and all inferences reasonably drawn therefrom must be construed in the light most favorable to the nonmovant. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the burden shifts to the nonmovant to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol

Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323 and Anderson 477 U.S. at 249). Neither conclusory allegations, improbable inferences, nor unsupported speculation are sufficient to defeat summary judgment. See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002); see also Price v. Canadian Airlines, 429 F. Supp. 2d 459, 461 (D.N.H. 2006).

### 3. Default Judgment against Northern States

On April 16, 2010, default judgment was entered by the court against Northern States. See Document no. 48; see also Fed. R. Civ. P. 55. Plaintiff's claims remain only against Jackson and shall be analyzed accordingly.

### 4. Lanham Act Trademark Infringement & Unfair Competition

Plaintiff argues it is entitled to summary judgment on both counts one and two because Jackson's admissions demonstrate there is no genuine dispute that he knowingly misused NeLMA's marks to misrepresent that his pallets had been heat-treated in compliance with ISPM 15. In Count I, plaintiff alleges Jackson's repeated, unauthorized use of its marks constituted trademark infringement,

9

in violation of 15 U.S.C. § 1114.[5]  In Count II, plaintiff alleges he is also liable under 15 U.S.C. § 1125 for unfair competition, because he misrepresented and falsely designated the origin of certain pallets by passing them off as having been heat-treated in compliance with ISPM 15 when they had not been.[6] Plaintiff also asserts that Jackson's deliberate misuse of NeLMA's marks has destroyed its goodwill and value, entitling it

---

[5] 15 U.S.C. § 1114(1) (West 2009) provides, in relevant part: "Any person who shall, without consent of the registrant, (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, [or] distribution . . . of any goods or services . . . is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction . . . to . . . . packages. . . intended to be used in commerce. . . which is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided."

[6] 15 U.S.C. § 1125(a)(1) (West 2009) provides:  "Any person who, on or in connection with any  goods or services, or any container for goods, uses in commerce any word, term name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

to injunctive relief and treble damages under 15 U.S.C. §§ 1116(d) & 1117(b).

Plaintiff only argues the facts, not citing any cases to support its position. Jackson does not dispute that he marked Northern States' pallets with the Index Packaging-NeLMA stamp, knowing that the pallets had not been certified by NeLMA and had not otherwise complied with the heat-treatment requirements of ISPM 15. He also concedes that he shipped those mislabeled pallets into the stream of commerce, understanding that customers and government officials would think the pallets complied with ISPM 15 and were pest-free. But Jackson asserts this conduct did not violate either § 1114 or § 1125. Jackson makes two arguments in support of this position.

First, he argues that NeLMA's marks do not cover WPM, but instead are limited to lumber. Jackson contends that because the misused stamp bore NeLMA's mark for the quality and grade of lumber, not for WPM compliance with ISPM 15, his use of the stamp on pallets did not infringe, misappropriate, devalue or otherwise misuse NeLMA's marks in violation of the Lanham Act. Jackson asserts that the separate certification programs for lumber and WPM, including both the distinct governing standards and the

11

different overseeing agencies, demonstrate that NeLMA's marks at issue here would not confuse, deceive or cause mistake in the minds of the relevant public about the quality or origins of his pallets.  As Jackson explains:  "NeLMA and the relevant industry treat lumber and wood packaging materials such as pallets as *separate* products and distinguish between the certification programs for them."  Defs.' Obj. to Pl.'s Mot. for Partial Summ. J. (document no. 40) ("Defs.' Obj.") at 3 (emphasis in original).

Second, Jackson argues that his misuse of Index Packaging's stamp did not violate the Lanham Act because NeLMA has not adequately policed its marks or enforced its ISPM certification program.  Because NeLMA did not even realize defendants had the stamp for nearly three years, Jackson contends NeLMA cannot claim its certification program was violated, misrepresented or devalued when NeLMA was not itself effectively overseeing it.

Likelihood of confusion is the critical issue in both plaintiff's trademark infringement and its unfair competition claims.  See Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc., 288 F. Supp. 2d 105, 113 (D.N.H. 2003) (citing authority), aff'd, 105 Fed. Appx. 285 (1st Cir. 2004).  "The Act protects both the public and the owner of a trademark by 'preventing the use of the

12

same or similar marks in a way that confuses the public about the actual source of the goods or service.'" Id. (quoting Star Fin. Servs. v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996)). To prevail, plaintiff must establish (1) that it uses the marks and so "owns" them, (2) that defendants used the same or similar marks, and (3) that defendants' use is likely to confuse the public and harm plaintiff as a result. See id. at 113-14. The facts clearly establish that plaintiff owns its marks and that defendant used them. The critical question on summary judgment, therefore, is whether Jackson's use of the marks caused the requisite confusion.

Whether Jackson's use of the Index Packaging stamp caused confusion to NeLMA's detriment is a question of fact, considering the following eight factors: "'(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark.'" Id. at 114 (quoting Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987). Assessing the record

13

against these factors demonstrates that plaintiff has not carried its burden of proving its marks were infringed. While certain factors, such as the similarity of the marks, the defendant's intent and the strength of plaintiff's mark point toward finding Jackson's use of Index Packaging's stamp was deliberately done to cause the relevant public of potential customs officials and buyers to believe his pallets complied with ISPM 15, there remain genuine questions about what NeLMA's marks in fact covered that are not answered by the evidence before the court.

As an initial matter, nowhere in the record is there any depiction of the Index Packaging stamp that Jackson used to demonstrate how NeLMA's marks were misused. The record indicates that certified facilities are issued a stamp which has three parts to it: the IPPC logo, the facility's unique number, and the certifying agency's stamp, NeLMA's here. What that stamp looks like and which of NeLMA's marks is part of the stamp is completely unclear. Are the three component parts together on one stamp, which tri-part stamp is then branded onto two sides of the WPM to certify that it comports with ISPM 15 standards? Or does the WPM just have to show all three marks somewhere on two separate sides, so that a NeLMA-marked piece of cut-up lumber is

14

sufficient to show ISPM 15 compliance?  The record suggests that the certification stamp for ISPM 15 compliance requires all three parts, as well as the letters "HT" branded onto the wood.  Based on my understanding of the current record, NeLMA's logo alone would not communicate that the WPM complied with ISPM 15.

Second, the registration forms for both the 831 mark and the 638 mark state that, "The certification mark, as used by authorized persons, certifies the quality level of the grade of lumber on which it is placed."  See 9/30/09 Snow Aff., ¶¶ 1 & 2. The registrations also state that the marks are for "Lumber, in Class A, . . .."  Id.  Certification marks work as a seal of approval of the mode of manufacture, the quality of the goods or some other characteristic of goods or services.  See 3 R. Callmann, Callmann on Unfair Competition, Trademarks and Monopolies, 4th ed. (West 2009) ("Callmann") § 17:18; see also 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, 4th ed. (West 2009) ("McCarthy") §§ 19:90-91 (describing certification marks).  NeLMA asserts that its certification programs work to preserve certain standards of quality in the lumber industry, and it has a well-established reputation that its marks guarantee a certain level of quality.

15

While that very well may be true, and Jackson's use of the Index Packaging stamp that incorporated NeLMA's logo substantiates that assertion, the record is entirely unclear about the meaning of the "quality level of the grade of lumber." Does quality level mean that the lumber comports with PS 20-05, or does quality level mean that the lumber complies with the processes required by ISPM 15, or does it mean both? Lumber is obviously the primary component of wood packaging materials, so certification of the lumber could designate certification of the WPM, see 3 McCarthy § 19:92.50; however, the "grade" of lumber designated by NeLMA's marks does not necessarily mean that it has been heat-treated in accordance with ISPM 15, as NeLMA's inspection program certifies. Based on the record before me, the 831 and 638 marks themselves do not communicate any clear message about compliance with international phytosanitary standards.

There are genuine issues of material fact about what Jackson's use of Index Packaging's stamp actually said to the relevant public. Jackson contends NeLMA is primarily involved in the lumber industry, as reflected by the registration statements of both the 831 and the 638 marks, so his use of the Index Packaging stamp on his WPM pallets did not cause any confusion.

16

But NeLMA describes its business as:

> NeLMA's signature service includes extensive up-to-date communications regarding the global implementation of [ISPM 15]. An easy reference summary of the latest information, in table format for each country, is provided on a regular basis and available online 24/7 to our customers. This valuable information tool is also available by subscription to others interested in staying abreast with the latest global wood packaging requirements.. . . In addition, the NeLMA staff is available upon request to present the details of the [ISPM 15 packaging standard] and the NeLMA Inspection Program to company personnel as a valuable service to potential customers or industry groups.

9/30/09 Snow Aff., ¶ 4 (attaching pages from website). This evidence demonstrates that NeLMA considers its primary service as helping enforce ISPM 15, not regulating the American lumber industry as Jackson proffers. How NeLMA uses its marks to signify its ISPM 15 inspection service as compared to its PS 20-05 inspection service is not clear. Maybe the marks indicate compliance with both standards. In any event, NeLMA has not made the requisite showing of clearly demonstrating what the 831 mark or the 638 mark represent. See 3 McCarthy § 19:93 (requiring that registered certification marks symbolize a designated service).

These unanswered questions require me to deny plaintiff's

17

motion for summary judgment on its Lanham Act claims against Jackson. This denial does not mean Jackson did not violate the Lanham Act; it simply means that plaintiff has not shown that the record leads to the single conclusion that Jackson's use of the Index Packaging stamp infringed its marks in violation of 15 U.S.C. §§ 1114 & 1125. Genuine issues of material fact remain about what NeLMA's marks actually convey to the relevant public. See id. §§ 19:91 & 19:92.50.

## 5. N.H. Consumer Protection Act Claim

In Count III, NeLMA alleges that Jackson's unauthorized use of its marks in his packaging business was a deceptive business practice in violation of the CPA. See N.H. Rev. Stat. Ann. ("RSA") 358-A:1, et seq. (West 2009). NeLMA further asserts Jackson's deceptive practices were willful and knowing, entitling it to the full panoply of damages available under the CPA. Jackson argues NeLMA's CPA claims are merely a restatement of its Lanham Act claims and therefore should be summarily denied for the same reasons its Lanham Act claims should be, or at least genuine issues of material fact preclude a decision at this time. Jackson also argues that he cannot be held individually liable because the facts do not justify applying the corporate veil

18

piercing doctrine, citing <u>Unit Owners Ass'n of Summit Vista Lot 8 Condo. v. Miller</u>, 141 N.H. 39, 677 A.2d 138 (1996).  Plaintiff counters that <u>Unit Owners</u> dictates the corporate veil of Northern States in fact can be pierced to hold Jackson personally liable, but also that Jackson should be held directly liable for violating the CPA.

Two issues may be quickly resolved.  First, since default judgment has been entered against Northern States, <u>see</u> section 3, <u>supra</u>, it is liable on the CPA claims against it.  Second, the doctrine of piercing the corporate veil is inapposite here.  The CPA applies to individuals, enabling NeLMA to assert its claims directly against Jackson.  <u>See</u> RSA 358-A:1, I (defining "Person" to include natural persons in addition to various business entities); <u>see</u> <u>also</u> <u>Unit Owners Ass'n</u>, 141 N.H. at 44, 677 A.2d at 141 (emphasizing that the person liable under the CPA is the unlawful actor); <u>Pacamor Bearings v. Minebea Co.</u>, 918 F. Supp. 491, 499 (D.N.H. 1996) (citing precedent for allowing "both natural persons and corporations [to] avail themselves of the protections and remedies afforded by the [CPA].").  Plaintiff did not plead that Northern States' veil should be pierced in order to reach Jackson, and it correctly argues now that Jackson' CPA

19

liability does not depend on the doctrine. See <u>Bartholomew v.</u> <u>Delahaye Group, Inc.</u>, Civ. No. 95-20-B, 1995 WL 907897, *10 (D.N.H. Nov. 8, 1995) (piercing the corporate veil pled as a separate count); <u>see</u> <u>also</u> <u>Druding v. Allen</u>, 122 N.H. 823, 827, 451 A.2d 390, 393 (1982) (requiring a distinct claim be asserted for piercing the corporate veil).[7]

There is no question that the CPA applies to the instant matter, and that Jackson violated its provisions. The CPA is "'a comprehensive statute whose language indicates that it should be given broad sweep.'" <u>Pacamor Bearings</u>, 918 F.Supp. at 499 (quoting <u>Roberts v. Gen. Motors Corp.</u>, 138 N.H. 532, 538, 643 A.2d 956, 960 (1994)). The CPA makes it "unlawful for any person

_____

[7]Plaintiff's CPA claims against Jackson depend on his personal unauthorized use of Index Packaging's NeLMA stamp and not some misuse of the corporate form that might justify piercing the corporate veil. <u>See</u> e.g. <u>Druding</u>, 122 N.H. at 827, 451 A.2d at 393 (finding individual not liable under veil piercing doctrine where he "neither suppressed the fact of incorporation nor misled the plaintiffs as to the corporate assets" to use *the corporate form* to promote an injustice); <u>Unit Owners Ass'n</u>, 141 N.H. at 44, 677 A.2d at 141 (declining to impose individual liability for acts of the corporate entity where corporate veil cannot be pierced); <u>cf.</u> <u>Bartholomew</u>, 1995 WL 907897 at *11 (describing when the comingling of assets, concealing the fact of incorporation and misleading creditors as to corporate assets can justify piercing the corporate veil to reach individuals); <u>Alman v. Danin</u>, 801 F.2d 1, 3-4 (1st Cir. 1986) (allowing corporate veil to be pierced to reach individual owners' assets to enforce a pension plan that unfunded, shell corporation fraudulently negotiated).

to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state" which includes, but is not limited to:

I.   Passing off goods or services of those of another;

II.  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

III. Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another; . . .

V.   Representing that goods or services have sponsorship, approval, [or] characteristics . . . that they do not have; . . .

VII. Representing that goods or services are of a particular standard, quality, or grade . . . if they are of another; . . ..

RSA 358-A:2 (describing unlawful acts).  If a business practice is not enumerated in the statute, it still is considered "unfair" if "(1) it is within at least the penumbra of some common-law, statutory, *or other established concept of unfairness*, (2) it is immoral, unethical, oppressive, or unscrupulous, or (3) it causes substantial injury to consumers." Pacamor Bearings, 918 F. Supp. at 499 (internal quotations omitted, emphasis in original); see also Becksted v. Nadeau, 155 N.H. 615, 619, 926 A.2d 819, 822-23

21

(2007) (looking to the Federal Trade Commission Act standard for guidance to determine unfair business practice). By its plain language, the scope of unlawful activity covered by the CPA is broader than the trademark infringement claims governed by the Lanham Act which plaintiff asserts here.

The undisputed record establishes that Jackson deliberately stamped pallets without any agreement or authorization from either Index Packaging or NeLMA. Jackson admitted he did this before business hours to prevent other people at Northern States from knowing that he was misusing the stamp. He further admitted that he allowed the mismarked pallets to be sold in his normal business operations through Northern States. While Northern States was the conduit through which Jackson's mislabeled goods got into the stream of commerce, nothing in the current record indicates the corporate entity was a sham which Jackson used to promote an injustice or fraud. Instead, the record establishes that Jackson was personally responsible for mislabeling the pallets to represent they were of a quality or standard which he knew was not true and for which he had not paid.

Regardless of what the scope of NeLMA's marks are, see discussion supra, section 4, by Jackson's own admission he used

Index Packaging's stamp to pass off his pallets as having some type of approval, certification, quality or other competitive and economic advantage that the pallets in fact did not have. This conduct, which persisted for nearly three years and only stopped after NeLMA discovered what Jackson was doing, unquestionably demonstrates an unfair business practice that unscrupulously sought to exploit the fortuitous misplacement of the Index Packaging-NeLMA stamp to profit his business. Jackson directly violated the CPA by personally stamping the WPM and moving the mismarked pallets into Northern State's inventory. Plaintiff's motion for summary judgment on Count III is granted with respect to Jackson's liability for violating the CPA.

Based on the current record, however, the issue of damages cannot be resolved. Plaintiff has not proffered any evidence that demonstrates the financial ramifications of these CPA violations, and genuine issues of material fact preclude a finding whether statutory damages rather than actual damages are appropriate. See RSA 358-A:10 (providing damages calculations for private CPA actions). Accordingly, plaintiff's motion for summary judgment with respect to damages, fees and costs is denied.

<u>Conclusion</u>

For the reasons set forth above, plaintiff's motion for summary judgment (document no. 38) is disposed of as follows:

Counts I and II - denied with respect to both liability and damages;

Count III - granted with respect to Jackson's liability but denied with respect to damages.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge


Date:   May 5, 2010

cc:     George F. Burns, Esq.
        Dawnangela Minton, Esq.
        James H. Jackson, pro se

24